[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/18/99
THOMAS K. KAHN
CLERK

————————————————

No. 99-4033

————————————————

D. C. Docket No. 98-07147-CV–SH

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

UNIQUE FINANCIAL CONCEPTS, INC.,
ERNEST J. PATTI, et al.,

Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————
**(November 18, 1999)**

Before BLACK, HULL and MARCUS, Circuit Judges.

BLACK, Circuit Judge:

Appellants Unique Financial Concepts, Inc. (Unique), Ernest J. Patti (Patti), Frederick N. Hollander (Hollander), and Nicholas D. DeAngelis (DeAngelis), appeal a preliminary injunction enjoining Appellants from violating the anti-fraud and securities registration provisions of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). The district court found that Appellants' activities were subject to the Securities Act because Appellants were offering investment contracts in which investor funds were to be pooled. The district court also found that the Commodity Exchange Act (CEA), 7 U.S.C. §§ 1- _ , did not preclude Appellee Securities and Exchange Commission (SEC) from regulating the investment opportunity offered by Appellants. We affirm.

## I. BACKGROUND

Hollander and Patti established Unique in October 1997. At its inception, Unique purported to offer the sale of foreign currency options. Unique advertised heavily on television, newspaper, and the Internet, promising large returns on small investments. These promises were not based on actual investments made by Unique. Prospective investors were sent a packet containing an offering document that described the foreign exchange market, a customer agreement, and a disclosure of risk statement.

2

The original customer agreement explained that the investments would be pooled together and that Unique had sole discretion over the investments. In August 1998, Unique modified its customer agreement by removing the language concerning the pooling of investments and Unique's sole discretion over these investments.

After receiving initial investments from investors, Unique deposited the funds into its bank account at Southern Bank in Fort Lauderdale, Florida. Unique sales representatives advised the investors as to which currencies they should invest in and how many puts and calls they should buy. The investor then spoke to a compliance officer, who explained the details of the investment and requested the investors' assent to the purchase.

A portion of the investors' funds then purportedly was wired to Capital Management International (CMI) and Asset Management Funding (AMF) in the Bahamas. According to Patti and other representatives of Unique, AMF was a holding company for clearing houses, while CMI was the clearing house responsible for carrying out Unique's option trades. Unique also claims it later contracted with two other Bahamian clearing houses, Forex International (Forex) and Nassau Bay Clearing, Ltd.

After the initial investment, Unique aggressively solicited the investors for additional investments. Eventually, however, Unique representatives were extremely

3

hard to reach and often failed to return phone calls. The investors lost significant amounts of money on their investments.

From October 1997 until October 22, 1998, Unique raised just over $6.5 million from investors using the above scheme. Of this amount, only $2,489,801 (38%) was wired to the Bahamas to the alleged clearing houses. The remainder of the investors' money was divided as follows: approximately $700,000 was paid to Unique sales representatives; approximately $1.2 million was paid for advertising (including $760,786.32 paid to DRE consulting, a company co-owned by Patti from which he received a substantial salary); approximately $300,000 was paid to Patti, Hollander, and DeAngelis, the lead sales representative; and approximately $1.6 million was paid for business and personal expenses, including checks made payable for car rentals and personal loans. In addition, approximately $644,000 of the investors' funds was distributed to new investors.

## II. THE PRELIMINARY INJUNCTION

The district court found that Appellants' activities were subject to the Securities Act and granted the SEC a preliminary injunction enjoining Appellants from violating anti-fraud and securities registration provisions of the Securities Act, 15 U.S.C. § 77q(a). Significantly, the district court found that no credible evidence existed to show that Appellants' "clearinghouses" ever placed trades on behalf of investors.

4

The court emphasized that Appellants failed to introduce any written agreements showing a relationship between Unique and the Bahamian clearing houses (Nassau Bay, CMI, or Forex). Patti claimed that Appellants did not have any copies of the contracts between the parties, and asserted, without citing any authority, that Bahamian law prevented Appellants from obtaining copies of the agreements from the Bahamas. The district court found that Patti lacked credibility and that the absence of any written agreements was "highly suspect." As a result, the court concluded that "the contract may be damaging to the [Appellants] and that they may be purposefully avoiding its production."

Although Appellants did produce option reports and monitoring sheets detailing the purported trades and client accounts, the district court noted that Appellants failed to authenticate any of these reports. Specifically, the court pointed to the fact that there were no transaction or wire verifications indicating that the clearing houses executed any trades. Although Appellants did produce alleged trade confirmations, these confirmations were sent from Appellants' office, not from the Bahamian clearing houses.

In addition, Patti testified that Appellants never received any bank records indicating the occurrence of the alleged trades, that he did not know how the Bahamian clearing houses executed the trades, and that he did not know how the

5

clearing houses were compensated for their services. Furthermore, Appellants' compliance officer testified that she did not know what the clearing houses did and did not even know what the term clearing house meant. Finally, Appellants' accountant, Morris Berger, stated that the "only thing we had to deal with is really the Unique data. And we don't have the Bahamian trading data . . . . Do I know that there was actual trading in the Bahamas? The answer is, no, I don't."

Thus, the court concluded, "at this juncture Unique has failed to produce one scintilla of independent evidence in support of its contention that investors' funds were invested in foreign currency options by clearinghouses in the Bahamas." In addition, the court stated that "at this stage of the litigation, it appears as though Unique either misused or converted investors' funds and have used an artifice to defraud."[1]

The district court nevertheless found that the "investments" offered by Appellants should be considered investment contracts, and thus concluded that the SEC did have jurisdiction to bring this claim. The court also held that the SEC had established a prima facie case of violations of the anti-fraud and registration

---

[1]In essence, the district court found that Appellants were operating a "Ponzi scheme." *See, e.g., SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995). That is, rather than executing currency trades, Appellants were keeping over 60% of the money. Appellants paid the rest of the money back to the investors "to fool them into thinking they were making money and should therefore invest more." *Lauer*, 52 F.3d at 670.

provisions of Section 17(a) of the Securities Act and issued a preliminary injunction enjoining Appellants from committing further violations.

## III. STANDARD OF REVIEW

A district court's grant of a preliminary injunction order involves a mixed standard of review. The decision to grant the injunction is reviewed for abuse of discretion. *See Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1505 (11th Cir. 1992). Questions of law supporting the injunction are reviewed de novo. *See Tefel v. Reno*, 180 F.3d 1286, 1295 (11th Cir. 1999). Findings of fact are reviewed for clear error. *See SEC v. Carriba*, 681 F.2d 1318, 1323 (11th Cir. 1982). When a preliminary injunction is challenged on the basis of jurisdiction, a plaintiff need only establish "a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits." *Majd-Pour v. Georgiana Community Hospital, Inc.*, 724 F.2d 901, 902 (11th Cir. 1984) (quoting *Industrial Electronics Corp. v. Cline*, 330 F.2d 480, 482 (3d Cir. 1964)).

## IV. ANALYSIS

The central issue in this case is whether the district court abused its discretion in finding that Appellee has shown a reasonable probability of ultimate success upon

the question of the SEC's jurisdiction over Appellants' conduct.[2] The determinative question within this issue is whether the contracts offered and sold by Appellants were investment contracts, and thus securities, under federal securities law.[3] If the contracts were investment contracts, then, contrary to Appellants' assertion, the SEC had jurisdiction under the federal securities laws to bring this suit.

A.  Three Prong *Howey* Test

In *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100 (1946), the Supreme Court established the classic test for determining whether a transaction is an "investment contract" within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).  In *Howey*, the Court explained that for the purposes of the

---

[2]Under Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), the SEC is entitled to a preliminary injunction when it establishes the following: (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 806-07 (2d Cir. 1975); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972).  On appeal, Appellants challenge only the SEC's jurisdiction over this matter.  Thus, we need not address whether the injunction granted in this case meets the above requirements.

[3]Under the Securities Act of 1933, a "security" is defined as:
[A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, reorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, an interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warranty or right to subscribe to or purchase, any of the foregoing.
15 U.S.C. § 77b(a)(1) (emphasis added).

Securities Act, an investment contract is "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *Howey*, 328 U.S. at 298-99, 66 S. Ct at 1103. This Court has divided the *Howey* test into the three elements: "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." *Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983), *aff'd en banc*, 730 F.2d 1403 (11th Cir. 1984). Both parties agree the first prong of this test has been satisfied. There is distinct disagreement, however, as to the second and third prongs.

1. Common Enterprise Prong

With respect to the second prong, we have adopted the concept of vertical commonality, holding that a common enterprise exists where "the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Villeneuve*, 698 F.2d at 1124 (quoting *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973)).[4] We previously had observed that "the fact that an investor's return is independent of that of other investors in the scheme is not decisive. Rather, the requisite

---

[4]Unlike the more stringent concept of horizontal commonality, utilized by the Second, Third, Sixth, and Seventh Circuits, *see, e.g., Stenger v. R.H. Love Galleries*, 741 F.2d 144, 146 (7th Cir. 1984), this flexible standard does not require investor funds to be pooled nor does it require profits to be shared on a pro rata basis.

commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter]." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974).[5] More recently, we have affirmed the formulations of *Villeneuve* and *Koscot,* instructing that "[t]he thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return." *Eberhardt v. Waters*, 901 F.2d 1578, 1580-81 (11th Cir. 1990).

Significantly, the fact that an investment company's operations are a sham and thus might not actually satisfy the common enterprise prong of the *Howey* test does not mean that the investment company can avoid the Securities Act. As the Seventh Circuit has noted, "[i]t would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws." *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995); *see also First National Bank v. Russell*, 657 F.2d 668, 673 n.16 (5th Cir. 1981) (noting that the SEC has jurisdiction even the "security purportedly traded is nonexistent or fictitious . . . . A contrary result would encourage rather than curb fraud.") (internal citation omitted).

Thus, in order to qualify as an investment contract, "it is enough that the [parties] merely offer the essential ingredients of an investment contract." *Howey*, 328

---

[5]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

U.S. at 301, 66 S. Ct. at 1104. After all, "[t]he Securities Act prohibits the offer as well as the sale of unregistered non-exempt securities." *Id*; *see also SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943) (noting that "[i]n the enforcement of [the Securities Act,] it is not inappropriate that promoters' offerings be judged as being what they were represented to be").

At trial, the district court found that the language of the original customer agreement, in conjunction with its conclusion that Appellants' operations were a sham, supported the existence of a common enterprise. The agreement, in relevant part, reads as follows:

> By executing this agreement, Client authorized [Unique] in its sole discretion to use the total funds on deposit in the omnibus account which includes the funds of the undersigned to execute single trades or transactions and to apportion the gains, losses, commissions, and clearing expenses *proportionally to each account. The results of each trade will be apportioned and applied proportionately (per unit) to all accounts open on the trade* and rounded down to the nearest US dollar. (emphasis added).

On appeal, Appellants contend that, despite the language of the original agreement, in actual practice it did not operate a horizontal investment pool but rather maintained individual, independent investment accounts. As support for this contention, Appellants point to cash flows between Appellants and the Bahamian clearing houses, the alleged trade reports, as well as testimony regarding the trades and trade reports. Appellants claim we should rely on the actual operation of its

11

investment contracts, rather than the language of the original agreement, to hold that Appellants' investment accounts do not meet the common enterprise prong.

However, given the absence of any credible documentation of trades, the absence of any persuasive testimony concerning these trades, as well as the fact that Appellants invested less than 40% of investors' money, we conclude the record supports the district court's finding that Appellants' operations were a sham. Consequently, we look, as did the district court, to the terms of the offer to determine whether Appellants' activities are covered by the Securities Act. As noted above, the terms of the offer explicitly state that investors' funds will be pooled and apportioned proportionately by Appellants to each account. This language clearly presents an offer for an investment in a common enterprise and thus supports the common enterprise prong of the *Howey* test.[6]

2. Expectation of Profits Prong

There is also distinct disagreement over whether Appellants' operations meet the "expectation of profits" element of the *Howey* test. In *Howey*, the Supreme Court explained that this prong requires that investors expect their "profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301, 66 S. Ct. at 1104. The courts

---

[6] Appellants claim that the language of the original agreement was a mistake, and that the language was changed to accurately reflect Unique's operations. The district court, however, made a factual finding that Appellants switched their customer agreement in August 1998 specifically to avoid liability under the federal securities laws.

have suggested several interpretations of the word "solely," with the disagreement centered on whether "solely" means all or merely predominant. The view this Court adopted in *Koscot*, 479 F.2d at 483, asks "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). One year after *Koscot*, the Supreme Court reaffirmed *Howey* and revisited this question in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S. Ct. 2051 (1975). In *Forman*, the Supreme Court held that "the touchstone" of an investment contract for purposes of the Securities Acts is "the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Id.* at 852, 95 S. Ct. at 2060. We subsequently explicitly embraced the *Forman* test.[7] *See Villeneuve v. Advanced Business Concepts, Co.*, 730 F.2d 1403, 1404 (11th Cir. 1984) (en banc).

In addition, this Court has clearly stated that "the crucial inquiry [for the third prong] is the amount of control that the investors retain under their written agreements." *Albanese v. Florida Nat'l Bank*, 823 F.3d 408, 410 (11th Cir. 1987)

---

[7]In *Villeneuve*, we refrained from deciding whether *Forman* and *Koscot* are consonant. We refrain from resolving this issue here as well.

13

(citing *Williamson v. Tucker*, 645 F.2d 404, 423-24 (5th Cir. 1981)). While we have yet to resolve the precise level of control dictated by *Forman* (and refrain from doing so here), we conclude Appellants' operation meets any reasonable interpretation of "solely."

First, contrary to Appellants' assertion, Appellants did not manage non-discretionary investment accounts in which individual investors made all key strategic decisions. Rather, as noted above, the record supports the district court's finding that Appellants did not engage in any actual trading, but instead operated a fraudulent scheme which misappropriated investors's funds. Thus, the investors retained no control over their investments, since there were no investments to control. Second, the original customer agreement specifically gave Appellants the "*sole discretion* to use the total funds" deposited by the investors. (emphasis added). Consequently, both the language of the agreement and Appellants' actual operations support the district court's finding that Appellants' operations met the third prong of the *Howey* test.

Because a review of the record indicates that all three prongs of the *Howey* test have been met, we conclude Appellee did establish a reasonable probability of ultimate success upon the question of jurisdiction. The district court therefore did not abuse its discretion in granting the preliminary injunction.

B. <u>The Commodities Exchange Act</u>

Appellants also argues that the Commodities Trading & Futures Commission (CFTC),through the Commodities Exchange Act (CEA), 7 U.S.C. §§ 1-_, divests the SEC of authority to bring this action.  The essential issue is whether the trading of futures of investment contracts is a securities transaction subject to the SEC's jurisdiction, a futures transaction subject to the CFTC's jurisdiction, or both.  Thus, this case "requires an inquiry into the relative boundaries of jurisdiction between the CFTC and the SEC as intended by Congress." *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 674-75 (11th Cir. 1988).

The "exclusive jurisdiction" provision of the CEA defines the ambit of the CFTC's exclusive jurisdiction over the commodities market.   It reads, in relevant part, as follows:

> [T]he CFTC shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option," "privilege," "indemnity," "bid," "offer," "put," "call," "advance guarantee," or "defined guarantee,") and *transactions involving contracts of sale of a commodity for future delivery*, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange or market . . . .

7 U.S.C. § 2 (emphasis added).  In contrast, the "SEC savings clause" preserves SEC authority over its traditional regulatory functions despite the CFTC's jurisdiction.  It reads, in relevant part, as follows:

15

[E]xcept as hereinabove provided, nothing contained in this section shall:

(i) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or any State, or

(ii) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

7 U.S.C. § 2.

Appellants note that this Court, in *Messer*, has upheld the exclusive jurisdiction of the CFTC over certain future trades. *See Messer*, 847 F.2d at 675. Appellants then claim the transactions in this case involved commodities futures, in the form of individual foreign currency options, and thus fall within the exclusive jurisdiction of the CFTC. We disagree.

While the exclusive jurisdiction provision applies to the offer and sale of a commodity for future delivery, Appellants concede that the SEC savings clause preserves the SEC's jurisdiction over the offer and sale of investment interests in a *commodity pool*.[8] Thus, if we conclude Appellants offered investment interests in a commodity pool, we also must conclude the SEC has jurisdiction over this case.

---

[8]Although, given Appellants' concession, we need not address this issue, there is extensive evidence that Congress intended the SEC to have concurrent jurisdiction over commodity pools. *See, e.g.,* 7 U.S.C. § 6m(2); H.R. Rep. No. 97-565 (Part I) at 82 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3931.

This Court has not defined the term commodity pool, but the CFTC regulations define "pool" as "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." 17 C.F.R. § 4.10(d)(1) (1998). This definition encapsulates Appellants' investor scheme. As discussed above, the district court explicitly found that the investors' funds were to be pooled and distributed on a pro rata basis for the (alleged) purpose of trading commodity interests. Appellants thus were offering an investment opportunity in a commodity pool which even Appellants admit is subject to the SEC's jurisdiction.

Appellants' reliance on *Messer* for the claim that the CFTC has exclusive jurisdiction over this case is misplaced. In *Messer*, this Court concluded that T-bond futures, a type of commodity, were under the exclusive jurisdiction of the CFTC. The T-bond futures at issue in *Messer* were traded in individual discretionary accounts. *See Messer*, 847 F.2d at 674, 679. In this case, however, as discussed above, the foreign currency options (allegedly) were traded in an investment or commodity pool. This distinction is critical. Commodities, such as the T-bond futures in *Messer*, are within the exclusive jurisdiction of the CFTC. Commodity *pools*, such as the foreign currency options pool in this case, are within the concurrent jurisdiction of the CFTC and the SEC.

We therefore conclude the CEA did not divest the SEC of authority to bring this action.

## IV.  CONCLUSION

The district court did not abuse its discretion in granting the preliminary injunction.  Appellants' activities were investment contracts covered under the Securities Act.  The SEC thus established a reasonable probability of success on the question of jurisdiction.  In addition, the CEA did not divest the SEC of authority to bring this action.

AFFIRMED.