Maximo **HADDAD**, an individual, Plaintiff,

v.

**RAV BAHAMAS, LTD.,** a foreign corporation, and Gerardo Capo, an individual, Defendants.

**Nos. 05–21013 CIV SEITZ, 05–21013 CV MCALILEY.**

United States District Court, S.D. Florida.

May 10, 2006.

Stanley Wakshlag at Kenny Nachwalter, P.A., Miami, FL, on behalf of the defendants, Rav Bahamas, Ltd. and Gerardo Capo.

Paul A. Shelowitz and Francisco Rodriguez at Akerman Senterfitt, Miami, FL, on behalf of the defendants, Rav Bahamas, Ltd. and Gerardo Capo.

Alexander Angueira and Christopher L. Barnett from Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. Miami, FL, on behalf of the plaintiff, Maximo Haddad.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND CLOSING CASE

SEITZ, District Judge.

THIS CAUSE is before the Court on Defendants' Motion to Dismiss Second Amended Complaint ("SAC"). Plaintiff Maximo Haddad alleges he invested $6 million dollars in a development project in Bimini pursuant to a joint venture agreement. He contends that such transaction involved the purchase or sale of securities because his joint venture interest is an investment contract under the federal securities laws and because such transaction involved traditional stock. Having reviewed all relevant portions of the record, and after hearing the oral argument of the parties, the Court grants Defendants' motion to dismiss as the parties' joint venture did not involve the purchase or sale of securities.

### I. BACKGROUND

The relevant facts in Plaintiff's SAC, taken as true for purposes of this motion, are as follows: Defendant Gerardo Capo ("Capo") founded Defendant Rav Bahamas Ltd. ("RAV") in the late 1990's to develop approximately seven hundred acres of land situated on North Bimini, in the Bahamas. (SAC ¶ 9.) Defendants intended to develop a resort hotel and other tourist projects on the property (the "Bimini Bay Project" or the "Project"). (*Id.* ¶ 10.) In July 1997, the Bahamian Government approved RAV's plans to develop the Bimini Bay Project and entered into a development agreement with RAV, known as the "Heads of Agreement." (*Id.*)

In early 2001, the Bahamian Government threatened to revoke the Heads of Agreement and RAV's development rights because it believed the Project was undercapitalized. (*See id.* ¶ 11.) "Desperately needing to assuage the Bahamian Government's concerns," Capo solicited Plaintiff to invest in the Project. (*Id.* ¶ 13.) Thereafter, Capo represented to Plaintiff that he had "unique knowledge of the Bahamian real estate market and the local zoning and land-use procedures" and that he had "unusual access to and influence

with high-ranking and influential officials of the Bahamian Government." (*Id.* ¶ 14.) Capo also informed Plaintiff that such knowledge and contacts were "essential" to the efficient and successful development of the Bimini Bay Project, and that accordingly, Capo would serve as the "hands on partner," whereas Plaintiff would "merely provide the financial backing the Bahamian Government demanded." (*Id.*)

In the months following their initial meeting, Capo and Plaintiff negotiated the terms of their joint venture. (*Id.* ¶ 15.) During these negotiations, Capo continued to tout his unique knowledge of the Bahamian real estate market and relationships with Bahamian officials, which he advised were essential to the success of the Project. (*Id.*) Following negotiations, Defendants and Plaintiff agreed to a joint venture strategy, which the parties memorialized in a Memorandum of Understanding ("MOU") dated April 11, 2001. (*Id.* ¶¶ 16–17; *Id.* Ex. E.)

Pursuant to the MOU, Plaintiff agreed, *inter alia*, to invest $10 million in exchange for a fifty percent equity stake in the Project. (*Id.* ¶ 16.) The MOU contemplated that RAV would transfer its interest in the Bimini Bay Project to several to-be-created companies, which would be jointly owned by RAV and Plaintiff, and of which they would receive equal shares.[1] (*See id.* ¶ 19, *Id.* Ex. E ¶¶ 5, 7.) Correspondingly, it provided that "RAV and Haddad will ... structure the assets of Rav to best realize the potential of the said company's assets." In addition, Capo was

to make "immediate arrangements" to introduce Plaintiff to the Prime Minister of the Bahamas "as his partner in the Bimini Bay Project" and to move to obtain all necessary approvals for the transfer of all rights under the Heads of Agreement to the parties' newly formed Bahamian companies. (*Id.* Ex. E ¶ 9.) The parties further contemplated that they would create additional companies "for the purpose of realizing the development of the project" and that they would engage others to manage such companies "as RAV does not have the resources or skill to accomplish the necessary facets of development." (*Id.* Ex. E ¶ 6.) Specifically, the parties agreed that they needed further expertise for the following: (1) carrying out the sales and marketing of the project; (2) carrying out all vertical and horizontal construction development; (3) managing the property while it is being developed; and (4) creating any other necessary companies. (*Id.* Ex. E ¶ 6.)

After the execution of the MOU, Defendants set out to satisfy the Bahamian Government's concerns with the project and to obtain the Bahamian Government's approval of Plaintiff. (*Id.* ¶ 23.) Accordingly, the law firm of Alexiou, Knowles & Co. wrote a letter to the Bahamian Government, which stated:

> Mr. Haddad has had extensive experience with various construction projects and developments primarily in Mexico and Panama. He has been responsible for building office buildings in both Mex-

---

1. At some undetermined point, the parties drafted a Shareholders Agreement "to regulate certain aspects of their relationship" and to place "restrictions on the transfer or other disposition of securities" of the to-be-created companies. (*Id.* Ex. F.) The Shareholders Agreement labeled the shares of such companies as "securities," but also provided that the Agreement would be construed and interpreted in accordance with the laws of the Com-

monwealth of the Bahamas and that any dispute arising thereunder would be settled by arbitration in Nassan, Bahamas. (*Id.* Ex. F ¶¶ 5.1, 5.2.) The Shareholders Agreement also provided that Capo and Plaintiff would alternate as serving as President and Chief Executive Officer of such company. (*Id.* Ex. F ¶ 3.2.) The parties never executed this agreement. (*See id.*)

ico and Panama as well as major highway thoroughfarea in Panama. The costs of the total roads constructed in Panama have exceeded one billion dollars and he has raised substantial money in the United States to assist him in the funding of such projects. Mr. Haddad brings depth and a wealth of experience to the Bimini project.

(*Id.* Ex. H at 1.) Thereafter, on September 18, 2001, the Office of the Prime Minister informed Defendants through Alexiou, Knowles & Co. that it would "undertake the normal due diligence to confirm the investor's bona fides and source of investment resources" and asked Defendants to provide all relevant information. (*Id.* Ex. I.) On September 27, 2001, the Office of the Prime Minister approved of Plaintiff's participation is a partner in the joint venture agreement with RAV. (*Id.* Ex. J at 1.)

Following the Prime Minister's approval, the parties, through Alexiou, Knowles & Co., began negotiating a new Heads of Agreement with the Bahamian Government. (*Id.* ¶ 29.) On January 7, 2002, the Bahamian Government informed Alexiou, Knowles & Co. that "[g]iven the recent experience with this project the Government is minded to increase its surveillance and monitoring of project implementation," and suggested the appointment of a semi-resident inspector. (*Id.* Ex. K ¶ 11.) The parties continued their negotiations through early 2004. (*Id.* ¶ 29.)

Between 2001 and 2004, Capo routinely briefed Plaintiff on the status of the Bimini Bay Project, indicating that the Project was proceeding according to plan, that the transaction documents were still being prepared, and that Plaintiff's investment was secure and producing returns. (*Id.* ¶ 32.) In August 2003, Plaintiff visited the Project and inquired as to the status of the transaction documents. (*Id.* ¶ 33.) In response, Capo made the following representations: (1) that Plaintiff's investment was secure and producing lavish returns; (2) that Plaintiff should not worry about the delays; (3) that Plaintiff and Capo were "like brothers," and that Plaintiff could rely on him; (4) that the transaction documents would be completed shortly; and (5) that Plaintiff's stock would be delivered soon. (*Id.* ¶ 33.) Relying on these representations, Plaintiff continued to make capital contributions and to treat Capo like a brother; indeed, Plaintiff and Capo dined and socialized often, and Capo and his family visited Plaintiff at his home. (*Id.* ¶¶ 34–36.)

According to Plaintiff, Capo "dominated the Project, maintaining exclusive executive control over the Project's day-to-day affairs, management and finances." (*Id.* ¶ 38.) Indeed, Capo "effectively precluded [Plaintiff] from exercising any oversight or control over his investment or the Project, notwithstanding his attempts to do so." (*Id.* ¶ 38.) Because Capo allegedly had a unique relationship with the Bahamian Government, Plaintiff "was required, by agreement as well as necessity, to rely upon Capo to communicate with the Bahamian Government and, more generally, manage the Project." (*Id.* ¶ 39.) Furthermore, because the new Heads of Agreement required negotiation and the transaction documents were in the process of being negotiated and prepared, Plaintiff could not realistically control or oversee the Project. (*Id.* ¶¶ 39–40.)

To this day, Defendants have not created the stipulated entities as agreed under the MOU. Rather, Defendants have sold off parcels of the Bimini Bay Project without sharing the profits therefrom and have siphoned off Plaintiff's investment for unrelated personal uses. (*Id.* ¶¶ 42–43.) Thus, Plaintiff contends that Defendants made the following false, material representations for the purpose of inducing him to invest in the Project: (1) that RAV

would convey all right, title, and interest in the Project to the stipulated entities; (2) that RAV would assign all right, title, and interest in the Heads of Agreement to the stipulated entities; (3) that Plaintiff's investment would be used solely for the purpose of carrying out the Project; and (4) that Plaintiff would take an equity stake in the Project and share in the Project's profits. (*Id.* ¶ 52.) Plaintiff contends that but for these misrepresentations, he would not have invested in the Bimini Bay Project. (*Id.* ¶¶ 42, 56.)

Finally, in February 2005, Plaintiff demanded an accounting and a review of the Project's books and records to determine his share of the profits from his investment. (*Id.* ¶ 47.) At that time, Capo refused to open the books and stated that Plaintiff held no stake in the Project. (*Id.*) Capo further instructed Plaintiff that Defendants treated his investment as a loan in the Project's books, and that they never intended to create the stipulated entities, much less issue any stock. (*Id.*)

## II. STANDARD OF REVIEW

Defendants have moved to dismiss the SAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Because Defendants' challenge to the Court's subject matter jurisdiction is also a challenge to the existence of a federal cause of action, and given that the parties do not cite to matters outside the SAC and the attachments thereto, the Court must resolve such attack pursuant to Federal Rule of Civil Procedure 12(b)(6). *See SEC v. Mutual Benefits Corp.,* 408 F.3d 737, 741–42 (11th Cir.2005). Rule 12(b)(6) provides that dismissal of a claim is appropriate

when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama,* 30 F.3d 117, 120 (11th Cir.1994); Fed.R.Civ.P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will ultimately prevail on the merits but instead, whether he has properly stated a claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). To survive a Rule 12(b)(6) motion to dismiss, a complaint generally need only provide a short and plain statement of the claim and the grounds on which it rests. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Moreover, a court must accept the plaintiff's allegations in the complaint as true and view those allegations in a favorable light to determine whether the complaint states a claim for relief. *S & Davis Int'l, Inc. v. Republic of Yemen,* 218 F.3d 1292, 1298 (11th Cir.2000).

## III ANALYSIS

■ In their Motion to Dismiss the SAC, Defendants argue that the Court lacks subject matter jurisdiction over this action because Plaintiff's SAC fails to present a federal question. Specifically, Defendants contend that Plaintiff's securities fraud claim must be dismissed because: (1) Plaintiff's joint venture interest is not an investment contract within the scope of the federal securities laws; and (2) the transaction at issue did not involve the purchase or sale of stock. After reviewing the SAC in the light most favorable to Plaintiff and considering the arguments of the parties, the Court must conclude that Plaintiff has not stated a federal claim.[2]

---

**2.** Given this conclusion, the Court will not discuss in depth Defendants' alternative argument that Plaintiff's claim is barred by the statute of limitations. However, taking the allegations in the SAC in the light most favorable to Plaintiff (*See* SAC ¶¶ 32–36, 39–40), the Court cannot determine at this stage of

the litigation that a reasonable person would have began investigating the possibility that his legal rights had been infringed sometime before April 2003. *See Tello v. Dean Witter Reynolds, Inc.,* 410 F.3d 1275, 1283 (11th Cir.2005). Thus, Defendants are not entitled to dismissal on this basis.

## A. The Parties' Joint Venture Falls to Meet the Howey Test

Plaintiff postulates that his joint venture interest is an investment contract, and thus a security. Both the Securities Act of 1933 and the Securities Exchange Act of 1934 define the term "security" as including "investment contracts." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). Although neither statute defines the phrase "investment contract," in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court defined the term as one that satisfies the following criteria: (1) an investment of money; (2) a common enterprise; and (3) the expectation of profits to be derived solely from the efforts of a third party or promoter. *Id.* at 298–99, 66 S.Ct. 1100. This definition requires courts to examine the economic substance of the transaction and is broadly applied to "encompass virtually any instrument that might be sold as an investment." *Mutual Benefits Corp.*, 408 F.3d at 742 (citations omitted). Nevertheless, courts recognize that the federal securities laws were not intended to provide a federal remedy for all fraud or misconduct arising out of a commercial transaction. *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). Thus, "[e]ach transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Id.* at 561 n. 11, 102 S.Ct. 1220.

■ Neither party disputes that the parties' joint venture agreement meets the first two elements of *Howey*. Thus, the key inquiry involves the final prong of the *Howey* test—whether Plaintiff expected his profits to come "solely" from the efforts of others.[3] In order to satisfy this prong of *Howey*, Plaintiff's investment must depend upon the "entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Whether an investor depends upon such efforts turns on the degree of control a plaintiff retains under the operative instrument and the economic realities of the parties' business relationship. *See Albanese v. Fla. Nat'l Bank*, 823 F.2d 408, 410 (11th Cir.1987) ("[T]he crucial inquiry [for the third prong] is the amount of control that the investors retain under their written agreements."). Joint venture agreements generally do not satisfy the third prong of the *Howey* test because an investor in a joint venture usually has the ability to control the profitability of his investment. *See Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir.1982) ("[G]eneral partnerships and other arrangements which grant the investors control over the significant decisions of the enterprise are not securities."). Thus, there is a "strong presumption" that a joint venture interest is not a security, and a party seeking to prove the contrary "must bear a heavy burden of proof." *Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir.1986); *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. May 1981).[4]

### 1. The Economic Substance Of The Parties' Transaction Indicates That Plaintiff's Joint Venture Interest Is Not A Security

The instrument at issue in this case, the MOU, was offered to a single investor in a private, one-on-one transaction. Defen-

---

**3.** The precise meaning of the term "solely" is unresolved in this Circuit. *See SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 n. 7 (11th Cir.1999).

**4.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

dants argued at oral argument that this is a pertinent factor for the Court's consideration.[5] In *Marine Bank*, the Supreme Court observed that all uncommon instruments found to constitute securities in prior cases involved offers to a number of potential investors, not just one. *Marine Bank*, 455 U.S. at 559, 102 S.Ct. 1220. The Supreme Court concluded that a single unique agreement, negotiated one-on-one between two parties, which is not ordinarily regarded as a security and that was never designed to be publicly traded, is not a security under the federal securities laws. *Id.* Similarly, in *Youmans*, where the plaintiff guaranteed several promissory notes in exchange for an equity interest in real estate, the Fifth Circuit concluded that the plaintiff's interests in such projects were not securities. The Fifth Circuit held, " '[t]hey were private transactions negotiated one-to-one between Youmans and appellees'. As such they do not fall within the ambit of the federal securities laws." 791 F.2d at 347 (citing *Marine Bank*, 455 U.S. at 559, 102 S.Ct. 1220). *See also Equitable Life Assurance Soc'y v. Arthur Andersen & Co.*, 655 F.Supp. 1225, 1242–43 (S.D.N.Y.1987) (holding that the parties' transaction did not involve securities where, *inter alia*, the parties neither distributed a prospectus to the investor nor solicited other investors and the unique agreement they negotiated was purely private and not designed to be traded publicly).

Applying the economic substance analysis to the facts in this case, Plaintiff's joint venture interest is not a security. Here, the economic reality reflected in the SAC is that the parties' negotiated one-on-one for an equal interest in the Bimini Bay Project. The MOU gave Plaintiff a substantial degree of control over his investment and does not have a provision allowing for assignment, facts Plaintiff cannot dispute. Furthermore, Plaintiff has not alleged that his joint venture interest would be publicly traded or that a prospectus was distributed to anyone. To the contrary, Plaintiff's allegations demonstrate that the Defendants specifically sought him out to bring not only his funding, but also his development expertise for a private transaction and that Plaintiff's involvement as a partner required the approval of the Bahamian Government. Accordingly, after examining the language of the MOU and the factual setting as a whole, Plaintiff's joint venture interest does not, as a matter of law, constitute a security.

---

**5.** Plaintiff, however, contends that the number of investors is not an appropriate factor for the Court's consideration because the Eleventh Circuit requires only vertical commonality of interests under the second prong of *Howey*. While some courts have interpreted *Marine Bank* to require horizontal commonality, which in turn mandates a pooling of assets among a diverse group of investors, *See e.g. Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96 (7th Cir.1977), Plaintiff is correct that the Eleventh Circuit requires only vertical commonality, and thus a single investor is not precluded from invoking the federal securities laws. *See Unique Fin. Concepts, Inc.*, 196 F.3d at 1199–1200. Nevertheless, the number of investors is a pertinent factor in evaluating the economic substance of a transaction and the factual setting as a whole. Indeed, other courts utilizing some form of the vertical commonality test have applied *Marine Bank* to hold that a private transaction, negotiated between two parties, is not a security. *See Mace Neufeld Prod., Inc. v. Orion Pictures Corp.*, 860 F.2d 944 (9th Cir. 1988) (holding that the parties' contract was not a security where the agreement was unique, private, and never intended to be publicly traded); *Youmans v. Simon*, 791 F.2d 341 (5th Cir.1986). Thus, while the number of investors in not dispositive, it is significant and must be taken into account, along with the other considerations discussed in *Marine Bank*.

### 2. Plaintiff's Allegations of Dependance Are Insufficient To Meet The Williamson Exception

■ Despite the control Plaintiff retained under the terms of the MOU, he contends that his joint venture interest is nevertheless an investment contract because he could not practically exercise any control over his investment. The Eleventh Circuit has refined the economic substance analysis and will find that a joint venture agreement falls within the scope of the federal securities laws in three narrow circumstances. Those circumstances are: (1) where the agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; (2) where the investor is so inexperienced and unknowledgeable in business affairs that he or she is incapable of intelligently exercising his or her power to control the investment; or (3) where the investor is so dependent upon some unique entrepreneurial or managerial ability of the promoter or manager that he or she cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers. *Williamson,* 645 F.2d at 424. Plaintiff concedes that the first two *Williamson* exceptions do not apply, but argues that the third exception is applicable because Defendants had unique expertise and knowledge and also practically precluded him from managing his investment. Unfortunately for Plaintiff, as discussed below, the alleged facts undermine his arguments.

### a. Plaintiff's Allegations Relating To Capo's Unique Abilities Are Belied By Other Allegations In The SAC

■ Plaintiff first argues that he could not exercise his venture powers because he was relying on the unique abilities of Capo. Specifically, Plaintiff alleges that Capo informed him that he had (1) unusual access to and influence with high-raking officials in the Bahamian Government; and (2) unique knowledge of the Bahamian real estate market and the local zoning and land-use procedures. Plaintiff further contends that Capo told him that such knowledge and access were essential to the efficient development and success of the Project, and as such, he had to rely on Capo to manage the Project.

While the Court must accept all well-pled allegations in the SAC as true, Plaintiff's allegations of Defendants' unique access to and influence with the Bahamian Government are contradicted by other allegations in the SAC and the attachments thereto. For instance, Plaintiff alleges that Defendants specifically sought him out to assuage the concerns of the Bahamian Government and acknowledges that the Bahamian Government approved of him as a partner in the joint venture. Moreover, the Bahamian Government communicated with the parties through the law firm of Alexiou, Knowles, & Co., demonstrating that Capo was not the only person with whom the Bahamian Government would communicate regarding the Bimini Bay Project. In addition, although Capo represented that he had unique knowledge of the real estate market and the local zoning and land-use procedures, the MOU indicates that the parties would hire other companies to carry out the construction of the Bimini Bay Project and to manage its development because RAV did not have the "resources or skill to accomplish the necessary facets of development." Moreover, because of its own concerns about the Project, the Bahamian Government indicated that it "was minded to increase its surveillance and monitoring of project implementation" and suggested appointing an intermediary to perform the same. Thus, given these allegations in the SAC, all of which undermine the allegations of Capo's unique knowledge, access, and expertise, Plaintiff has failed to come within

this limited exception and to overcome the strong presumption that a joint venture interest is not a security.[6]

b. *Plaintiff Has Not Adequately Alleged That He Could Not Replace Capo Or Otherwise Exercise Control Over His Investment*

Plaintiff next argues that he could not practically exercise any control over his investment. In support of this position, the SAC includes the following allegations: (1) that the parties had an understanding that Capo would be the "hands on partner," whereas Plaintiff would provide the financial backing; (2) that Capo maintained exclusive control over the Project and precluded Plaintiff from exercising any oversight despite his attempts to do so; and (3) that Plaintiff had no realistic ability to control or oversee the Project because the new Heads of Agreement required renegotiation and the transaction documents were in the process of being negotiated and prepared.

■ Plaintiff's first contention, that the parties had an understanding that Plaintiff would not, in fact, have any managerial role, is contradicted by the terms of the MOU itself. Although the recitals in the MOU provide that Plaintiff is "interested in becoming an investor," the governing provisions of the MOU afford Plaintiff with substantial control.[7] Thus, notwithstanding Plaintiff's allegations that he believed Capo would be managing the Project, his voluntarily decision to relinquish control does not convert his joint venture interest into a security. *Gordon*, 684 F.2d at 741–42 ("The fact that the investor has delegated management duties or has chosen to rely on some other party does not establish dependency.").

Citing to *Unique Fin. Concepts, Inc.* to support his second and third contentions, Plaintiff maintains that Capo had complete control over the Project to Plaintiff's exclusion and that he had no realistic ability to exercise control over the Project because the parties were in the process of preparing the transaction documents. In *Unique Fin. Concepts, Inc.*, the defendants solicited investors and instructed them that their funds would be invested in foreign currency options by certain clearinghouses in the Bahamas. *Id.* at 1197–98. According to the defendants, the investment accounts gave individual investors the ability to make all key strategic decisions, and thus, the investors had control over their investments. *Id.* at 1201. In reviewing the evidence, however, the district court found that no credible evidence existed to show that such clearinghouses ever placed any trades on behalf of the investors and that the investors' written agreement gave

---

**6.** Although Capo represented that he had unique knowledge of the real estate market and unusual access to the Bahamian Government, there is a distinction between having unique knowledge or access and being uniquely capable. *Gordon*, 684 F.2d at 742 (noting that in order to survive a motion to dismiss, the plaintiff must allege at a minimum that the promoter is uniquely capable of performing the particular tasks). Here, although Capo represented that his unique knowledge and access were essential to the success of the project, Capo did not allege that no one else had such knowledge or that he was irreplaceable. To the contrary, as discussed above, other allegations in the SAC and the attachments thereto indicate that others could, and indeed did, have similar knowledge and access as Capo. Thus, this case is distinguishable from *Gordon*, where the promoter not only represented that he had unique contacts and expertise, but that "only he knew how to structure the deals." *Id.* at 742.

**7.** Furthermore, the parties' draft Shareholders Agreement provides that Plaintiff and Capo would alternate as President and Chief Executive Officer over RAV–Haddad (I) Limited, a company the parties anticipated forming under the MOU.

the defendants the *"sole discretion"* to manage their funds. *Id.* (emphasis added). Accordingly, the Eleventh Circuit affirmed the district court's conclusion that the investors expected their profits to come solely from the efforts of others.

The instant case is distinguishable from *Unique Fin. Concepts, Inc.* because the MOU itself gave Plaintiff significant authority over his investment, including the authority to designate companies to carry out the purposes of the joint venture agreement. Accordingly, under the MOU, Plaintiff himself could have taken steps to oversee and manage his investment. Thus, given the terms of the MOU and Plaintiff's concession that he has extensive experience with various construction projects and developments and brings a depth and a wealth of experience to the Bimini Bay Project, his conclusory allegations that he was precluded from exercising any control over his investment "despite his attempts to do so" are insufficient to survive dismissal under *Williamson* and *Gordon.* *See also Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240–41 (4th Cir.1988) ("[T]he mere choice by a partner to remain passive is not sufficient to create a security interest."). Likewise, Plaintiff's contention that he could not exercise control until the transaction documents were complete does not demonstrate the type of reliance necessary to meet the narrow *Williamson* exception. Given that Plaintiff neither alleged that he tried to expedite the completion of such documents nor that he took any affirmative steps to manage his investment, such allegations indicate that he chose to remain passive, and not that he could not exercise control or replace Capo.[8] Presumably, if such facts existed to

support these missing allegations, Plaintiff would have alleged them in his third attempt to invoke this Court's jurisdiction.

The allegations in the SAC state that Defendants acted fraudulently with respect to the dealings between the parties. However, the federal securities laws do not provide Plaintiff a remedy. As the Supreme Court has instructed, the federal securities laws were not intended to provide a federal remedy for all fraud or misconduct arising out of a commercial transaction. *Marine Bank*, 455 U.S. at 556, 102 S.Ct. 1220. If this Court were to find Plaintiff's allegations in the SAC sufficient to allege a violation of the federal securities laws, it would be expanding the scope of *Williamson* such that the "strong presumption" that a joint venture interest is not a security would be rendered meaningless. More importantly, unlike the cases applying *Williamson* in the Eleventh Circuit, here, the allegations in the SAC clearly reveal that the MOU was a private, unique agreement that was never intended to be publicly traded. As in *Marine Bank*, the parties' joint venture agreement "is not the type of instrument that comes to mind when the term 'security' is used and does not fall within 'the ordinary concept of a security.'" *Id.* at 559, 102 S.Ct. 1220. Accordingly, having reviewed the economic substance of this transaction, the Court concludes that Plaintiff's joint venture interest is not an investment contract under *Howey*.

### B. Plaintiff's Investment Does Not Embody The Traditional Characteristics Of Stock

Plaintiff's principal argument is that the SAC alleges a transaction involv-

---

8. It is noteworthy that in *Unique Fin. Concepts, Inc.* the defendants aggressively solicited a large number of investors by sending them packages containing an offering docu-

ment, a customer agreement, and a disclosure risk statement, all indicia that the parties intended the securities laws to apply to their transaction.

ing traditional stock. The Court disagrees. In *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), the Supreme Court held that an instrument which was denominated "stock," and which embodies the traditional characteristics of stock, is a security for purposes of the federal securities laws. *Id.* at 686–87, 105 S.Ct. 2297. According to the Supreme Court, the characteristics usually associated with common stock include: (1) the right to receive dividends contingent upon an apportionment of profits; (2) negotiability; (3) the ability to be pledged or hypothecated; (4) the conferring of voting rights in proportion to the number of shares owned; and (5) the capacity to appreciate in value. *Id.* at 686, 105 S.Ct. 2297. Where an instrument is traditional stock in both name and characteristics, a court need not look to either the economic substance of the transaction or apply the test enunciated in *Howey*. *Id.* at 690–92, 105 S.Ct. 2297. Thus, in *Gould v. Ruefenacht*, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), where the plaintiff purchased 50% of the stock of a company, the Supreme Court held that such instrument was a security without applying the *Howey* test.

In the instant case, the operative instrument is the MOU, pursuant to which Plaintiff agreed to invest approximately $10 million in exchange for a fifty percent equity stake in the Bimini Bay Project. Plaintiff concedes that the MOU is not stock, as it neither bears the label stock nor embodies any of the characteristics traditionally associated with stock. However, Plaintiff urges the Court to look beyond the MOU, arguing that Plaintiff and RAV were to

acquire equal shares of companies to be created in the future, and that those shares would have the characteristics of common stock, as evidenced by an unexecuted, draft "Shareholders Agreement" attached to the SAC. Plaintiff's argument misses the mark.

*Robinson v. Glynn*, 349 F.3d 166 (4th Cir.2003) is informative on this point. In *Robinson*, the plaintiff invested approximately $25 million in exchange for a membership interest in a limited liability company. *Id.* at 168–69. In conjunction with this investment, the parties also signed an operating agreement, pursuant to which plaintiff received approximately one fourth of the company's shares. *Id.* at 169. The plaintiff argued that these shares gave his investment the traditional characteristics of stock under *Landreth*. The Fourth Circuit, however, rejected the argument, holding that the plaintiff's membership interest was not a security, despite the fact that the plaintiff received shares as a result of his investment. *Id.* at 172–74. Applying *Robinson* to the facts of this case, although Plaintiff was to receive stock as a byproduct of his investment under the MOU, such fact does not convert his investment into a security.[9]

## IV. CONCLUSION

For the reasons discussed above, the economic realities of the parties' business relationship was a joint venture interest that is not governed by the federal securities laws. Thus, Plaintiff's claim does not raise a federal question and this Court does not have subject matter jurisdiction. Therefore, it is hereby

---

9. The parties' Shareholders Agreement, even if executed, would not have the traditional characteristics of stock, as it is silent as to the apportionment of dividends in relation to profits and the apportionment of voting rights and gives Plaintiff and Capo a limited right of first refusal. Furthermore, it appears that the

parties did not contemplate that the federal securities laws would apply to the Shareholders Agreement, as the Agreement states that it "shall be governed and construed in accordance with the laws of the Commonwealth of the Bahamas" and is subject to arbitration in Nassau, Bahamas.

ORDERED that Defendants' Motion to Dismiss Second Amended Complaint is GRANTED.[10] All pending motions not otherwise ruled upon are DENIED AS MOOT. This case is CLOSED.

10. The Court declines to exercise jurisdiction over Plaintiff's related, state law claims.