**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Patrick KIRKLAND, Tropical Village, Inc., Clarity Development Corporation, and Senior Adult Living Corporation, Defendants,**

**Sunset Bay Club, Inc., Summerhill Ventures, Inc., Pelican Bay Club, Inc., and Isleworth Adult Community, Inc., Relief Defendants.**

No. 6:06–cv–183–Orl–28KRS.

United States District Court, M.D. Florida, Orlando Division.

Sept. 25, 2007.

Robert K. Levenson, Brian P. Knight, Elizabeth Fatovich, Raynette Nicoleau, Securities & Exchange Commission, Miami, FL, for Plaintiff.

Patrick Kirkland, Windermere, FL, Pro se.

## ORDER

JOHN ANTOON II, District Judge.

Before the Court are cross-motions for summary judgment filed by the SEC (Doc. 188) and Defendant Patrick Kirkland (Doc. 304) and the parties' respective responses (Docs. 203 [1] & 312) and replies (Docs. 271 & 320). The matter is ripe for resolution.

### I. Background

If it sounds too good to be true, you may be listening to Patrick Kirkland. While to investors he boasted thirty years' experience in the real estate development business and seven years' experience develop-

---

1. Kirkland's Response to the SEC's motion also included a Motion to Strike, to which the SEC responded (Doc. 208). The Motion to Strike was partially granted by the magistrate judge (Order, Doc. 295, filed May 25, 2007) and Exhibits 7 and 44 were stricken from the SEC's motion for summary judgment. Kirkland's contention that the Court should not consider the sworn statements attached to the SEC's motion is unavailing. "Sworn statements given before court reporters are at least as reliable as signed affidavits and are proper-

ly considered on summary judgment." *Bozeman v. Orum*, 422 F.3d 1265, 1267 n. 1 (11th Cir.2005). Kirkland has offered no evidence to either rebut the SEC's motion or support his own. Throughout the proceedings, he has repeatedly asserted his Fifth Amendment privilege against self-incrimination. The SEC urges the Court to draw an adverse inference against him on this basis, but such an inference seems unnecessary in light of the overwhelming evidence presented.

ing senior triplexes—a dormitory-style, shared living concept for senior citizens—he failed to mention investors' class action and individual lawsuits, two Desist and Refrain Orders and a Temporary Restraining Order issued by the state of California against him and his companies, falsified leases, inflated appraisal values, and relatively nonexistent leasing patterns in the units he was selling as a "sure thing" investment opportunity. His investors, who were assured an estimated annual net cash profit of, in some cases, $31,000, were losing money quickly because the little rental income taken In was insufficient to cover the expenses of operating the developments, much less cover the mortgages on the properties. As his investors were sinking, Kirkland was buying houses, apartments, and two engagement rings, each of which cost as much as a luxury car. He was traveling in a "corporate plane" flown by a private pilot; driving a Rolls Royce, a Porsche, and three Lexuses; and living in a home worth more than $4 million. His lavish lifestyle was funded by his investors' initial deposits in his "sure thing" investment concept.

On February 16, 2006, the SEC filed the instant Complaint against Kirkland and his companies—Tropical Village, Inc., Clarity Development Corporation, and Senior Adult Living Corporation, naming, as Relief Defendants, Sunset Bay Club, Inc., Summerhill Ventures, Inc., Pelican Bay Club, Inc., and Isleworth Adult Community, Inc.[2] (Compl., Doc. 1.) The SEC brings four counts against Kirkland. In Count I, the SEC alleges that Kirkland sold unregistered securities in violation of sections 5(a) and 5(c) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§ 77e(a) and (b). In Counts II–IV, the SEC alleges

that Kirkland committed securities fraud in violation of section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1); sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (a)(3); and section 10b of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and its subsequently promulgated Rule 10b–5, 17 C.F.R. § 240.10b–5.

## II. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986).

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1991); *see also* Fed.R.Civ.P. 56(e) (providing that the nonmovant "must set forth specific facts showing that there is a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all

---

**2.** The Relief Defendants are real estate development entities; Sunset Bay Club and Pelican Bay Club are in Florida, Summerhill is in Georgia, and Isleworth Adult Community is in Texas. (Green Sworn Statement at 12–13, Jan. 11, 2005, Ex. 8 to Doc. 188.)

reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505.

### III. Analysis

#### A. Kirkland's Senior Triplex Offerings Are Investment Contracts

The primary legal issue and threshold matter for each of the counts asserted against Kirkland is whether his senior triplex offerings constitute an offer or sale of securities within the meaning of the Securities Act. Kirkland admits that he did not register his triplex investments with the SEC, and he has not claimed that he is entitled to any exemption of the registration requirement. (Am. Answer ¶¶ 33 & 59.) Thus, if the offerings are securities, Kirkland violated sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (b).[3] Kirkland argues that the triplex offerings were not securities but instead were fee simple real estate transfers that are not regulated by the SEC. For the following reasons, the Court determines that Kirkland was engaged in the offering and sale of unregistered securities and that summary judgment must be entered as to Count I.

■ The definition of a security includes stock, of course, and, among other things, investment contracts. 15 U.S.C. § 77b(a)(1). Congress intentionally defined "the term 'security' in sufficiently broad and general terms so as to include within the definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 847–48, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (quoting H.R.Rep. No. 85, at 11, 73d Cong. (1st Sess.1933)). This broad construction was designed "to afford the investing public a full measure of protection." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Courts are therefore called upon to look at the substance and "economic realit[ies]" of the underlying transaction rather than its label or form. *Id.* at 298–99, 66 S.Ct. 1100; *see also Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

■■ The Securities Act does not define 'investment contract,' but the United States Supreme Court has defined it as:

---

**3.** Sections 5(a) and (c) of the Securities Act "make it unlawful, absent an exemption from registration, for any person to make use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell [or] to sell ... any security ... when no registration statement has been filed or is in effect as to the security." *SEC v. Chem. Trust,* No. 00–8015–CIV, 2000 WL 33231600, at *9(S.D.Fla. Dec. 19, 2000); *see also* 15 U.S.C. §§ 77e(a) & (b). In addition to admitting that he did not register his offerings, Kirkland also admits advertising in the Wall Street Journal and Money Magazine (Am. Answer ¶ 1), admits utilizing a website generally available to the public (*id.* ¶ 25), admits sending prospective investors packages detailing the investment opportunity (*id.* ¶ 27), and admits calling prospective investors (*id.* ¶ 28), who were located all across the country. Thus, if Kirkland's offerings constitute securities, he has violated the provisions of the Securities Act raised in Count I.

a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Howey,* 328 U.S. at 298–99, 66 S.Ct. 1100. "It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. 1100. It reaches "[n]ovel, uncommon, or irregular devices, whatever they appear to be." *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 88 L.Ed. 88 (1943). An investment contract may be present even "where the tangible interest which is sold has intrinsic value independent of the success of the enterprise as a whole." *Howey,* 328 U.S. at 301, 66 S.Ct. 1100.

Real estate transactions do not typically constitute investment contracts or securities, particularly when the purchaser is "interested in acquiring housing rather than making an investment for profit." *Forman,* 421 U.S. at 860, 95 S.Ct. 2051. Certain real estate investments may constitute securities that must be registered, however, when the sale itself is tied to a collateral rental or service agreement, when the purchase is motivated by economic inducements and expected profits, when the purchaser expects to participate in a profit-sharing or rental pooling arrangement upon completing the transaction, or when the transaction includes restrictions limiting the owner's control over the property. *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, Se-*

*curities Act,* 1973 WL 158443, Release No. 33–5347, 1 Fed. Sec. L. Rep. (CCH) ¶ 1049 (Jan. 4, 1973), *available at* 1973 WL 158443 (hereinafter Release, 1973 WL 158443); *see also Howey,* 328 U.S. 293, 299–301, 66 S.Ct. 1100. The SEC has advised that "the offering of [real estate] units in conjunction with any one of the following will cause the offering to be viewed as an offering of securities in the form of investment contracts":

1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units[;]

2. The offering of participation in a rental pool arrangement; and

3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

*Release,* 1973 WL158443, at *3. By contrast, when real estate units "are not offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of others, and assuming that no plan to avoid the registration requirements of the Securities Act is involved," the unit owner "may enter into a non-pooled rental arrangement with an agent not designated or required to be used as a condition of purchase" and the transaction will not involve the sale of a security. *Id.*

▮ With these guidelines in mind, the Court analyzes Kirkland's triplex offerings under the three-pronged *Howey* test to

determine if they are investment contracts. Under this test, an offering is an "investment contract" if there is: "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir.1999) (quoting *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir.1983)): *see also Hocking v. Dubois,* 885 F.2d 1449, 1455 (9th Cir.1989).

### 1. An Investment of Money

 *Howey's* first prong requires that there be a "commitment of assets in such a manner as to subject oneself to financial loss." *SEC v. Comcoa Ltd.,* 855 F.Supp. 1258, 1260 (S.D.Fla.1994) (citing *Stowell v. Ted S. Finkel Inv. Servs., Inc.,* 489 F.Supp. 1209, 1223 (S.D.Fla.1980)). One hundred nineteen people invested $70.3 million into Kirkland's scheme. These funds represent either deposits on re-

served triplex units or outright purchases made between 1999 and February 2006.[4] (Yip Aff. ¶¶ 5–6 & Ex. A thereto, Ex. 41 to Doc. 188.) Some developments were sold out of triplex units, others had more than half of the units sold before the SEC initiated its action against Kirkland. (Johnson Sworn Statement at 71–72, Dec. 21, 2004, Ex. 6 to Doc. 188; Brooks Sworn Statement at 14–15, Dec. 28, 2004, Ex. 13 to Doc. 188; Green Sworn Statement at 29–30, Jan. 11, 2005, Ex. 8 to Doc. 188.)

Investors' deposit money was not placed in escrow as in the typical real estate transaction (Johnson Sworn Statement 41; Showalter Sworn Statement at 18–19, Jan. 21, 2005, Ex. 12 to Doc. 188; Beaver Sworn Statement at 13–14, July 23, 2004, Ex. 15 to Doc. 188), but was instead placed in Kirkland's bank accounts, from which he withdrew his employees' salaries and commissions, finds for new construction projects and real estate, and money to provide for his own lavish lifestyle.[5] (Brooks

**4.** Kirkland argues that the SEC has failed to carry its burden of proof because "the facts cited [by the SEC] do not support the SEC's claim that '[w]hile virtually all of [the 119] investors were losing thousands of dollars a month, Kirkland was using more than $8 million of their money to fund an extravagant lifestyle.'" (Doc. 203 at 9.) He faults the SEC for only filing statements or affidavits of 14 investors. Kirkland's dispute with the SEC's statement misses the mark. The inquiry into whether the triplex offerings were securities requiring registration does not depend on the success of the venture, whether Kirkland's motive was genuine, whether he reaped a substantial profit, or whether any investors actually profited from the scheme. If his offerings were securities, they were required to be registered in accordance with federal securities regulations.

**5.** Kirkland's administrative assistant, Laura Wade, averred that she prepared company checks including some that were "payable to cash" for Kirkland's use (Wade Aff. ¶ 4, Ex. 5 to Doc. 188) and that the company regularly paid between $25,000 and $30,000 per month

for Kirkland's personal expenses, including his mortgage and car payments, his child support obligations, his monthly dues at private clubs, his personal trainer's fees, his credit card bills, and expenses related to the "company" plane, which he regularly used for personal matters such as flying in a friend for golf or transporting a young girl to his girlfriend's daughter's birthday party. (*Id.* ¶¶ 5–7; *see also* Johnson Sworn Statement at 121–25, Dec. 21, 2004, Ex. 6 to Doc. 188; Green Sworn Statement at 34, Jan. 11, 2005, Ex. 8 to Doc. 188; Brooks Sworn Statement at 77, Dec. 28, 2004, Ex. 13 to Doc. 188.) In addition, money was taken out of Tropical Village's account for a $65,000 engagement ring, a $4,000 to $8,000 allowance for Kirkland's ex-wife, a $100,000 country club membership, and a Harley Davidson. (Wade Aff. ¶ 6.) Mr. Johnson, the accountant, has also attested to the suspect financial practices of Kirkland and his companies, including using company funds—commingled with investors' deposits—for substantial personal expenses. (Johnson Sworn Statement at 90–105.) For example, Kirkland kept his brother, Thomas, on the payroll, even though Thomas did no

Sworn Statement at 96–100,103; Beaver Sworn Statement at 32–33.) Also unlike a typical real estate transaction, the same units were often promised to multiple investors. James Johnson, Tropical Village's accountant, stated that sometimes more than one name would be assigned to a unit because the first deposit would fall through, so the unit would be resold. (Johnson Sworn Statement at 76.) Other times, however, the same unit would be inexplicably double-sold to different investors at the direction of Kirkland. (*Id.;* Green Sworn Statement at 40; Brooks Sworn Statement at 77 (recalling Kirkland saying he was like the airlines and would doublebook) and 109–10 (recounting Kirkland selling two units that investor Marta Navarro had paid a deposit on); *see also* Navarro Decl., Ex. L to Espinosa Decl., Ex. 14 to Doc. 188.) At closing, the contracted units were shuffled around depending on actual availability. (Johnson Sworn Statement at 76–77; Brooks Sworn Statement at 49; Beaver Sworn Statement at 12–13, 30–31; *see also* Angel Decl. ¶¶ 5–7, Ex. 16 to Doc. 188.)

Kirkland solicited investors with nationally-run ads placed in The Wall Street Journal, The New York Times, Money Magazine, Smart Money, The Los Angeles Times, and the San Francisco Chronicle. (*Id.* at 30–31; Green Sworn Statement at 9; Brooks Sworn Statement at 114; Ex. I to Espinosa Decl.) The ads marketed the

triplexes as investment opportunities, not as places to live. (Brooks Sworn Statement at 42.) *Cf. Forman,* 421 U.S. at 858, 95 S.Ct. 2051 ("What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use.").

Although Kirkland does not assert any argument with respect to the first prong of *Howey,* it is instructive to detail a typical transaction. If an investor wanted to purchase a triplex unit, he or she would initially put up $6,000 as partial payment of the 10% deposit of the total purchase price of the unit.[6] (Johnson Sworn Statement at 36, 39–40.) Later, the remainder of the 10% would be due. As an incentive for investors to close on a unit, Kirkland would offer to "rent out" the buyer's unit for either 6 months or 12 months, in order to cover the investor's mortgage payments until the unit was rented; Kirkland promised investors positive cash flow. (Johnson Sworn Statement at 43–45, 49, 127; Green Sworn Statement at 12, 27, 38–39; Showalter Sworn Statement at 30, 32; Brooks Sworn Statement at 50; Ex. B to Adams Decl., Ex. 22 to Doc. 188.) Kirkland also had Tropical Village pay 3% of the closing costs to offset the time it took to build the triplexes. (Green Sworn Statement at 12;

---

work for the business, and other employees received personal loans or regular draws from the company accounts. (*Id.* at 9, 13, 15, 16: *see also* Brooks Sworn Statement at 93.) Heather Showalter, a sales agent, said that Kirkland bought a castle-like estate in Scotland for his brother and that she also took a message from a realtor in Belize who was responding to an inquiry from Kirkland. (Showalter Sworn Statement at 66–67, Jan. 21, 2005, Ex. 12 to Doc. 188.)

6. The purchase price of a unit, containing 5–7 bedrooms available to rent, ranged from $595,000 to $825,000. (Am. Answer ¶ 18; Showalter Sworn Statement at 15–17.) At times, a lower price would be offered, but just prior to closing, Kirkland would represent to the investor that the value of the investment had just increased. Kirkland sometimes "purchased" a unit from Tropical Village at a higher price to serve as a comparable, though inflated, sale for the next appraisal. (Johnson Sworn Statement at 66–71; Brooks Sworn Statement at 47.)

Brooks Sworn Statement at 40.) In some instances, he also held a second mortgage on the property, which was not disclosed in the HUD statements. (Showalter Sworn Statement at 40–41; Brooks Sworn Statement at 60–61; Beaver Sworn Statement at 70–71.)

Kirkland promised and contracted to return the entirety of an investor's deposit if the investor was unable to secure funding or if the investor visited the units and changed his or her mind about the investment. Many investors wanted out for either of these reasons, but Kirkland did not refund their money easily. He told investors that they were in breach of contract and that he was entitled to keep the deposit as damages. Sometimes, when threatened with a lawsuit, Kirkland would refund deposits. Others still wait for their earnest money to be returned. (*See, e.g.,* Johnson Sworn Statement at 82–83 (recounting two investors who referred other purchasers and who lost their large down payments when the closing fell through) & 107–08 ("[T]here was always a reason why we were owed that deposit, either we would say they defaulted on the contract, or they didn't earnestly try to get a loan, or something. There was always some excuse."); *see also* Beaver Sworn Statement at 42, 74–79.)

Investors made their "purchases" with the expectation of returning a profit. The investors' risk of financial loss was exacerbated by their lack of control over the investments and by their complete dependence on the efforts of Kirkland, his staff, and the management companies he hired for the endeavor's success. A large number of people invested a great deal of money into Kirkland's failing scheme. The first prong of the *Howey* test is satisfied.

### 2. Common Enterprise

 Two types of commonality may satisfy *Howey's* second prong, the common enterprise element. Vertical commonality exists where " 'the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties.' " *Unique Fin. Concepts,* 196 F.3d at 1199 (quoting *Villeneuve,* 698 F.2d at 1124). Horizontal commonality exists where there is "a pooling of interests or profits" in the transaction. *See Hocking,* 885 F.2d at 1459.

The Eleventh Circuit has held that vertical commonality is sufficient to satisfy *Howey's* common enterprise element, finding it more "flexible" and less "stringent" than horizontal commonality. *Unique Fin. Concepts,* 196 F.3d at 1200 n. 4. As the SEC has pointed out, however, Kirkland's triplex investment scheme satisfies the Eleventh Circuit's standard as well as the stricter standard of horizontal commonality, thus easily meeting *Howey's* second requirement that the scheme involve a common enterprise.

### a. Vertical Commonality

 If the investors' money is tied to the efforts and success of someone else— whether it be the promoter or a third party—vertical commonality is present in the scheme. *Id.* This inquiry largely overlaps with *Howey's* final prong. " 'The thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return.' " *Id.* at 1200 (quoting *Eberhardt v. Waters,* 901 F.2d 1578, 1580–81 (11th Cir.1990)). They are passive as opposed to active investors.

 Kirkland's triplex offerings satisfy the vertical commonality test because the investors had little to no control over the success of the endeavor or the future of their investments. That control rested in

the hands of Kirkland and the management company that he chose and controlled. Together, they advertised for tenants, chose and approved tenants, collected rent, and maintained the premises. (Showalter Sworn Statement at 31–32; Adams Decl. ¶ 7.) Investors could neither assume control of the rental process nor choose the rate at which their units were rented. Indeed, the investors purchased their units under the expectation that a certain rate would be charged to tenants, but some found that the rental rates were unilaterally and surreptitiously lowered in an attempt to attract tenants to an undesirable living arrangement. (Beaver Sworn Statement at 46.) Kirkland and the management company controlled the offering of rental incentives, which lowered any expected or projected return the investors would hope to earn. (*See, e.g.,* Mem. from Kim Meredith–Hampton, Premier Management Group, Inc. of Harbor Bay, Inc. to Kirkland and Brooks, Ex. E to Espinosa Decl.) Kirkland decided to stop requiring background checks of tenants, which, together with the incentives offered, harmed the reputations of the developments because such decisions attracted a less than desirable tenant population. (Beaver Sworn Statement at 45–46, 49.) Kirkland,

the management company, and the sales agents intentionally concealed information about occupancy rates and tenant interest from investors. (Johnson Sworn Statement at 113; Showalter Sworn Statement at 23–24, 45.) Some investors were not even allowed to see the units they owned when they visited the property because they were told that the tenants did not want to be disturbed.

Kirkland urges the Court to look at the purchase contracts and at the existence of homeowners' associations [7] and determine that the investors maintained ultimate control of their units. However, any control held by the investors or by the homeowners' association was illusory; the management company took care of everything. Indeed, it was this promise that lured the distantly-located, unsophisticated investors into Kirkland's scheme.

### b. *Horizontal Commonality*

■ A scheme has horizontal commonality if the investors pool their assets and "give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise." *Hocking,* 885 F.2d at 1459. Such investors "make their collective fortunes dependent on the success of a

---

**7.** Kirkland points to a sales letter sent to investor and board member Karen Bowman, which reads:

> The triplexes will be managed through a professional management company well experienced in the method of managing these properties. The Pelican Bay Homeowners Association Board of Directors governs the management company. In this way, each owner is assured of input into the performance of the management company and into decisions about maintenance of standards in the community. Each owner will not be required to be involved in the day-to-day operation of the triplex. The management company will be responsible for collecting rent, advertising, showing potential residents the available bedrooms, and soliciting

> contractors to repair and maintain the interiors, exteriors, and grounds. This is absentee ownership at its best.

(Letter from Kevin Crandall, Sales Executive, to Karen Bowman, Aug. 19, 2002, Ex. A to Bowman Decl., Ex. 11 to Doc. 188.) Kirkland emphasizes the statement that the Board of Directors governs the management company. In reality, however, the only function of the Board appears to have been issuing bills and occasionally credits—though rarely making an actual monetary distribution—to investors after the operational expenses were paid from the incoming revenue. (*See. e.g.,* Ex. E to Adams Decl., Ex. 22 to Doc. 188) Emphasis is rightly placed on the responsibilities of the management company and the allure of "absentee ownership."

single common enterprise." *Id.* Rental pooling agreements meet the standard for horizontal commonality. *Release*, 1973 WL 158443, at *3.

■ Kirkland's senior triplex investments were offered with the promise of a rental pooling agreement.[8] Although Kirkland disputes that he played any role in implementing the pooling arrangement,[9] ample evidence indicates otherwise. The pooling arrangement, in which investors theoretically stood to profit from the development as a whole even if their individual units remained unoccupied, was a major selling point and a strong incentive for investors. (Beaver Sworn Statement at 27; Woodley Decl. ¶ 8, Ex. 18 to Doc. 188; Angel Decl. ¶ 5, 8; Adams Decl. ¶ 6.) Kirk-

land's accountant testified that "because the project wasn't working as planned, [Kirkland] came up with the pooling idea to make it sound like there's gonna be some revenue coming out. But, it didn't matter how you ... cut it, there was never going to be revenue—There wasn't enough revenue to support the expenses.... And so, yes, there is a pooling system. All it means is that the losses are shared equally." (Johnson Sworn Statement at 59.)[10]

Kirkland suggested the pooling idea to investor Karen Bowman, the eventual President of the Sunset Bay Homeowners' Association. (Bowman Decl. ¶ 11, Ex. 11 to Doc. 188.) He told her that the Board had to implement the pooling agreement because if *he* did so, it would be a violation

---

8. There were actually two pooling arrangements, one for early investors who signed on before January 1, 2004, and one for those who signed on after that date. (Johnson Sworn Statement 63–64.) Those in the second, or later pool, stood to "receive substantially less revenue." (*Id.* at 64.) Even though most investors who have provided affidavits or declarations have stated that they were enticed by the pooling arrangement promise, it appears that investors were unaware of a two-tiered system until after they purchased their units. (Beaver Sworn Statement at 64.)

9. There is some evidence that the initial idea to pool rents may not have been Kirkland's. Kirkland told Heather Showalter, a sales representative, that he did not implement the pooling agreement, that the investors did; and, while he told her to tell investors about the arrangement, he told her to be clear that he did not initiate it. (Showalter Sworn Statement at 28–30.) Joanna Brooks, Tropical's de facto Vice President, said that an investor named Ben Malarkey suggested the pooling concept for Harbor Bay at the ground-breaking ceremony in 2001. (Brooks Sworn Statement at 30–31.) When Linda Beaver was hired as a sales representative, Kirkland told her that they could not sell the units with the pooling agreement because it would be like selling shares, but she was told to present the pooling idea to potential investors. (Beaver Sworn Statement 26–28.) The pooling agreement was presented with the

sales pitch, but legally, the company had to let the homeowners' associations come up with the idea. (*Id.* at 28.) Kirkland provided the association with the legal paperwork to implement the pooling scheme. (*Id.*) Even if it is true that the pooling arrangement was the brainchild of an early investor, it is ultimately immaterial to the conclusion that a rental pooling arrangement was in place, that it was part of the "package" offered to investors, that it was a selling point and incentive to purchase a triplex, and that after the arrangement was implemented at a given development, participation in it would be mandatory for later investors. No matter how far Kirkland tries to distance himself from the pooling concept, it is clear that he adopted it as his own; he pushed for it and sold it to unwitting purchasers. His scheme easily satisfies the more stringent standard of horizontal commonality, thereby meeting *Howey's* second prong requiring a common enterprise.

10. Johnson also said that Kirkland designed the pooling system to minimize his having failed to furnish the units, as he was contractually obligated to do. (*Id.* at 78; *see also* Beaver Sworn Statement at 37–38.) In other words, it should not matter to an investor to have an unfinished, untenable unit if all of the rental income is pooled together and then distributed.

of SEC regulations. (*Id.*) Kirkland tries to spin this point in his favor, emphasizing how he tried to distance himself from the pooling concept [11] (Doc. 203 at 14), but all this reveals is that he knowingly attempted to evade the application of the securities regulations; it does not immunize the conduct he initiated in contravention of the law. Kirkland was on the Board as Secretary and Treasurer at the first Sunset Bay Board meeting, where the pooling agreement was the first order of business (Bowman Decl. ¶ 12), and the Board used Kirkland's attorney to draft the pooling agreement. (*Id.* ¶ 13 & Exs. C & D thereto).

The record evidence reveals that the pooling arrangement went hand-in-hand with the purchase of a triplex. The promise of rental income even in times of vacancy was a major selling point to hesitant investors. Based on the horizontal commonality evidenced by the rental pooling agreement, Kirkland's triplex offerings satisfy the second *Howey* element of common enterprise.

### 3. Expectation of Profits Produced by the Efforts of Others

 Kirkland's primary argument centers on the last prong of the *Howey* test, which he correctly identifies as the most litigated of the three. (Doc. 203 at 9–10.) Although *Howey* indicated that the expectation of profits must "come *solely* from the efforts of others," 328 U.S. at 301, 66 S.Ct. 1100 (emphasis added), many courts, including the Eleventh Circuit, have re-

jected a literal or strict interpretation and have instead interpreted "solely" to mean substantially or primarily. *Stowell,* 489 F.Supp. at 1221–22; *Comcoa,* 855 F.Supp. at 1261; *see also Forman,* 421 U.S. at 852 n. 16, 95 S.Ct. 2051 (acknowledging that the Ninth Circuit construed the word "solely" "realistically ... to include ... those schemes which involve in substance, if not form, securities" and not strictly or literally, but expressing no view because the Court had no opportunity to consider the issue in that case (referring to *SEC v. Glenn W. Turner Enters.,* 474 F.2d 476, 482 (1973))); *Messer v. E.F. Hutton & Co.,* 833 F.2d 909, 915–16 (11th Cir.1987). The Eleventh Circuit's inquiry asks " 'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " *Unique Fin. Concepts,* 196 F.3d at 1201 (citing *SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 479 (5th Cir.1974),[12] and quoting *Glenn W. Turner Enters.,* 474 F.2d at 482). In *Forman,* the Supreme Court removed the emphasis from the word "solely" and held that "the touchstone" of the test is "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." 421 U.S. at 852, 95 S.Ct. 2051. An investor's degree of control over his investment is to be determined practically. *See Hocking,* 885 F.2d at 1460; *SEC v. Merch. Capital, LLC,* 483 F.3d 747, 754–55 (11th Cir.2007). Even under a

---

**11.** Kirkland also concealed the existence of a rental pooling agreement from lenders. (Johnson Sworn Statement 62–63) (recalling falsely answering a direct question about pooling in lenders' questionnaires on Kirkland's orders and stating, "I remember I had to fill some of those out, and I had to redo them because [Kirkland] wanted the questions to read that there was no pool.").

**12.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down on or before September 30, 1981.

strict interpretation of "solely," however, Kirkland's scheme satisfies the final element of *Howey.*

In an investment contract scheme, "the investor is 'attracted solely by the prospects of a return on his investment ... [and is not] motivated by a desire to use or consume the item purchased— to occupy the land or to develop it themselves.'" *Forman,* 421 U.S. at 852–53, 95 S.Ct. 2051 (quoting *Howey,* 328 U.S. at 300, 66 S.Ct. 1100). The level of control that investors have over their properties is key to determining whether the scheme involves an investment contract. *Unique Fin. Concepts,* 196 F.3d at 1201. "If the investor retains the ability to control the profitability of his investment, the agreement is no security." *Albanese v. Fla. Nat'l Bank of Orlando,* 823 F.2d 408, 410 (11th Cir.1987). If the scheme is designed so that the investor can remain passive while reaping the benefits of the investment, it is likely that *Howey's* third prong has been satisfied. *See Hocking,* 885 F.2d at 1461.

 Kirkland's sales agents report that while an investor could live in one of the units he or she owned if the investor had no children and could perhaps decorate the unit, the investor could not modify it, control the price at which the unit was rented, or hire an independent rental management company. (Beaver Sworn Statement at 49–51.) The investors were not involved in any aspect of purchasing the land or of designing, constructing, furnishing, or decorating the units. (Green Sworn Statement at 13.) They were not involved in advertising, collecting rent, or doing anything beyond making mortgage and expense payments. (Showalter Sworn Statement at 31–32.) The advertisements indicated that the purchase price included management and financing. (Ex. I to Espinosa Decl.)

Investor Adams was told that the management company was in place and doing everything—running ads, managing the properties, collecting rent, and issuing checks to the Investors. (Adams Decl. ¶ 7.) Investor Shanahan was also assured that he would not have to do any work to maintain his investment because the onsite management company handled everything. (Shanahan Decl. ¶ 8, Ex. 23 to Doc. 188.) Investor Dimapasok was told that he did not "even need to manage the property" and that it "was being done" for him. (Dimapasok Decl. ¶ 3, Ex. 19 to Doc. 188.) The motto of the company appeared to be that investors just had to sit back and collect their checks.

A sales letter to a potential investor stated:

> Tropical Village, Inc. oversees the management company and does this on a not-for-profit basis. **Each owner *will not* be required to be involved In the day-to-day operation of the triplex.** The management staff will be responsible for advertising, showing potential residents the available bedrooms, [and] maintenance of the interiors/exteriors and the grounds. The management company will also be responsible for the collection of rents, paying bills, remitting checks to the investor(s) and will handle the day-to-day bookkeeping operation.

(Letter from Jackie Jordan, Sales Executive for Tropical Village, Inc., to Caren Adams, Apr. 1, 2004, Ex. A to Adams Decl. (emphasis in original).)

As indicated above in the vertical commonality analysis, any control held by the investors "was illusory and insufficient to disqualify the investment as a security." *See Eberhardt,* 901 F.2d at 1581: *see also Albanese,* 823 F.2d at 412; *Plunkett v. Francisco,* 430 F.Supp. 235, 239 (N.D.Ga. 1977). Although there is little evidence

regarding the relative sophistication of the investors, the very distance at which they lived from the developments underscores the fact that the investors never intended to manage their units. *See Howey,* 328 U.S. at 299–300, 66 S.Ct. 1100 ("They are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products. Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment."); *Hocking,* 885 F.2d at 1461. Investors' sole purpose was to provide funding for Kirkland's myriad schemes; in return, they were assured substantial returns on their cash investments.

Although the investment scheme in *Howey* concerned a stake in a citrus fruit enterprise and Kirkland's involves triplex units for seniors, there is little to substantively distinguish either setup. As the Supreme Court in *Howey* concluded:

> Thus all of the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed. The investment contracts in this instance take the form of land sales contracts, warranty deeds and service contracts which respondents offer to prospective investors. And respondents' failure to abide by the statutory and administrative rules in making such offerings ... cannot be sanctioned under the Act.

*Howey,* 328 U.S. at 300, 66 S.Ct. 1100. Kirkland offered and sold unregistered securities in violation of sections 5(a) and 5(c) of the Securities Act.

### B. Kirkland Committed Securities Fraud When Offering Or Selling His Securities

Because Kirkland was selling securities, he was required to comply with the regulations governing their sale. The SEC claims, however, that instead of complying, Kirkland committed fraud in the offer and sale of his investment contracts. Namely, the SEC accuses Kirkland of violating section 17(a) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and section 10(b) of the Exchange Act and Rule 10b–5, which proscribe fraudulent conduct in the purchase or sale of securities. *SEC v. Chem. Trust,* No. 00–8015–CIV, 2000 WL 33231600, at *9 (S.D.Fla. Dec. 19, 2000).

Under these facts, the SEC may establish a violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 if they show that Kirkland made a(1) misrepresentation or omission (2) that was material, (3) with scienter, (4) and made in the offer or sale of securities and made in connection with the purchase or sale of a security, and that he (5) used interstate commerce, the mails, or a national securities exchange in furtherance of his acts. *Merch. Capital,* 483 F.3d at 766; *Chem. Trust,* 2000 WL 33231600, at *9. Establishment of a violation of sections 17(a)(2) or (3) of the Securities Act requires satisfaction of similar elements, but it requires only a finding of negligence, not scienter. *Merch. Capital,* 483 F.3d at 766; *Chem. Trust,* 2000 WL 33231600, at *10.

Kirkland admits advertising in nationally-run magazines and newspapers, maintaining a public website, and that he and his sales representatives mailed offering

materials to potential investors and used the telephone to communicate with them regarding the investments. (Am. Answer ¶¶ 1, 25, 27, 28.) Moreover, as is clear from the statements themselves, they were all related to his triplex offerings and they all concern investors; thus, each was made in the offer or sale of Kirkland's real estate units, which are securities. Therefore, only the first three elements need be discussed.

### 1. Misrepresentations or Omissions

The SEC contends that Kirkland made misrepresentations and omissions falling into four separate categories, any one of which would be sufficient to establish that he violated the anti-fraud provisions of the securities laws. (Doc. 188 at 14.) The misrepresentations or omissions the SEC claims Kirkland made are: (1) baseless profit projections based on false tenant occupancy rates, (2) false statements regarding high tenant demand for the triplexes, (3) failure to disclose the California Desist and Refrain Orders and a Temporary Restraining Order, and (4) failure to disclose investor lawsuits. (*Id.*)

### a. Baseless Profit Projections and False Tenant Occupancy Rates

To entice potential investors, Kirkland and his sales representatives quoted inflated estimated profit margins to potential investors through advertisements, offering packages, and in direct response to investor inquiries. Even though the cash flow sheet and the ads often utilized the single words "projected" or "estimated," projections are nonetheless actionable as misrepresentations if there is no reasonable basis to support them. *Merch. Capital,* 483 F.3d at 766–67, 768–69; *In re John Alden Fin. Corp. Sec. Litig.,* 249 F.Supp.2d 1273, 1277 (S.D.Fla. 2003). Further, sales letters quoting annual net cash flow and direct communications to investors did not contain those same limitations, and none of the letters or information included any cautionary language or discussions of the risks involved. Kirkland's unchecked optimism surrounding his senior triplex idea was deceitful.[13] *See Merch. Capital,* 483 F.3d at 769.

Kirkland changed the projected cash flow return sheet almost weekly, usually towards a higher estimate. (Green Sworn Statement at 11; Showalter Sworn Statement at 21–23; Beaver Sworn Statement at 5–6 (reporting rates as high as 35% projected in the advertisements).) The cash flow sheets projected annual returns anywhere from 21–51%. (Showalter Sworn Statement at 21–23.) Returns in the advertisements ranged from 29–55%. (Ex. I to Espinosa Decl.) Beaver told investors that the net cash flow was about $17,000 annually after all expenses and mortgage payments were made. (Beaver Sworn Statement at 51–53.) A sales letter sent to a prospective purchaser stated, "[N]et cash flow after all expenses and monthly mortgage payment is approximately $21,000.00 annually. **Purchasing one of our units enables you to receive a 29% net return while taking advantage of the tax depreciation.**" (Letter, Ex. A to Adams Decl. (emphasis in original).) The expected cash return quoted to investors Littlefield and Malarkey was between

---

**13.** Kirkland argues that his offering materials did not promise an *"immediate* 95% occupancy rate."* (Doc. 203 at 11.) Kirkland again misses the mark. There was no basis for projecting or continuing to project a 95% occupancy rate in his triplexes immediately or in the near or distant future. Moreover, his agents made unqualified statements that the developments were already averaging a 95% occupancy rate. The projection and the statements are material misrepresentations in violation of securities regulations. His promises to rent out the units himself for a period of time are immaterial.

35 and 55%. (Brooks Sworn Statement at 27–28.) Bowman was quoted a 40–45% return rate. (Ex. A to Bowman Decl.) Kirkland told investor Ferdinand Dimapasok that the triplexes were a "great investment," and that other "investors are happy with their investments." (Dimapasok Decl. ¶ 6.) Ana Rodriguez, the sales representative, told Mr. Dimapasok that investors were making "great profits" and that the triplexes were "solid investments." (*Id.* ¶ 3.) There is no evidence before the Court that any investors were happy with their investments or that any of them turned even a modest profit.

Joanna Brooks realizes now that the income for each of the projects is insufficient to pay their operating expenses and that Kirkland was essentially running a debt service. (*Id.* at 37.) Disturbed by the state of the business, Brooks resigned; she could not understand building more units when the existing projects were failing. (*Id.* at 68.) Beaver left the company too because the company's statements of positive cash flow were false and she felt that there was deception surrounding the product she was representing. (Beaver Sworn Statement at 39–40.)

The profits that investors could expect to reap were directly correlated with tenant occupancy. Kirkland's estimated cash flows were based on a 5% vacancy rate, or, stated differently, a 95% occupancy rate. (*See e.g.,* Ex. A to Bowman Decl.) The qualification was entirely absent in a sales letter sent to Ms. Helen Hughes about Sunset Bay; it read, "The demand for this type of living is incredible. We are now building brand new townhomes using the same successful concept. We currently have over 30 townhomes open and they are averaging 95% + occupancy, which is providing each of our investors with a true **43% cash on cash return.**" (Letter from Kevin Crandall, Sales Executive, to Helen Hughes, Mar. 30, 2001, Ex. R to Espinosa Decl.) Occupancy rates never approached those estimates or even 50% of those estimates. Kirkland controlled the flow of information regarding occupancy rates. (Johnson Sworn Statement at 113.) At one point, even the management companies in charge of leasing units were directed to send investors with occupancy inquiries to Kirkland rather than distribute the requested information. (*Id.* at 113–14: *see also* Mem. from Kirkland to Harbor Bay Investors, May 29, 2003, Ex. W to Espinosa Decl. (asking investors to stop pressuring the manager for information about occupancy and leasing).) Sales representative Heather Showalter told investors that the occupancy rate at Sunset Bay was over 50%, but if the investors wanted specific numbers, she directed them to Kirkland. (Showalter Sworn Statement at 23–24.) She tried to contact the management company for more accurate information on occupancy rates, but no numbers were ever given to her. (*Id.* at 24–25.) Eventually, she directed all occupancy inquiries to Kirkland. (*Id.* at 25.) She told investors that it took 12 months to fill a triplex unit, but she had no basis for that estimate. (*Id.* at 45.) Even if occupancy rates were close to what Kirkland projected, however, the actual income would still fall far short of his estimations because the rooms were rented at much lower rates and for shorter lease periods than were represented to investors.

In spite of the fact that the rental concept was unpopular to senior citizens and that little to no income was coming in relative to expenses, Kirkland put up a strong, though entirely manufactured, front for investors and lenders. He had his employees draft fake leases so that investors would be approved by their lenders (Johnson Sworn Statement at 60–61; Brooks Sworn Statement at 69–70; Beaver

Sworn Statement at 20–21; Email from Patty Brewer, Property Manager to various employees at Tropical Village, Inc., Jan. 12, 2004, Ex. G to Espinosa Decl.), thereby misleading both the financial institutions and the purchasers as to the current number of tenants in their units. If a potential investor was unsure about Kirkland's triplexes, Kirkland would sometimes direct the investor to people posing as investors for references. (Johnson Sworn Statement at 82.) Kirkland had his daughter pose as a fake investor, and she also recruited friends for the task. (Brooks Sworn Statement at 26; *see also* Email Exchange between Kim Kirkland and Linda Beaver, Feb. 3, 4, 9, 2004, Ex. H to Espinosa Decl. (discussing using a fake last name, setting up a fake email address, signing up other friends to serve as references, and asking for information "about the investments that we have ventured into").) His ex-wife's fiance was also asked to serve as a reference. (Brooks Sworn Statement at 26–27.) Kirkland paid those "references" referral fees, even though the "references" were never investors in Kirkland's developments. (*Id.*)

Kirkland's projected rates of return were grossly inflated. Indeed, the investors who have supplied declarations in support of the SEC's motion continue to lose substantial amounts of money each month, and some are in foreclosure. Despite the dismal rental records at all of his developments, Kirkland never adjusted the projected cash returns that were based on a 95% occupancy level, and he continued to represent to investors that units were renting quickly and that investors were making great profits. Kirkland had no reasonable basis for his initial projections and certainly had no basis for continuing to raise the projected rate of return after he realized his business model was failing. He nonetheless used that projected rate of return to lure unwitting investors; his direct, unqualified statements regarding net cash flow and occupancy were blatantly false.[14]

### b. False Statements Regarding High Tenant Demand

▮▮▮ Kirkland and his agents also made misrepresentations about the level of tenant interest in each of the developments. The offering materials sent to potential investors and the company website included a Frequently Asked Questions section, with the question, "Will the triplexes stay full?" The answer read:

> We have been leasing and managing these types of properties for seven years. We get approximately 200 phone calls per day when running very small ads. Typically, we don't even need to advertise. For $675 per month, they get a furnished place to live with all utilities paid, free telephone, free cable TV, complete kitchen facilities, and a coin-operated washer/dryer in their triplex. This is a phenomenal deal for the tenant. We have had no problems keeping the triplexes full.

**14.** The Commissioner of Corporations in California also found that Kirkland and his employees and companies "have failed and continue to fail to inform prospective purchasers that income projections made to investors have repeatedly turned out to be false because actual occupancy rates and rental rates of the senior triplex facilities have turned out to be much lower than represented. The real rates have turned out to be so low that triplex investments yield no profits and instead burden investors with monthly obligations to make payments to cover the shortfall between rental income and triplex loan, rental and management expenses." (Ex. 39 to Doc. 188 ¶ 14.) Kirkland and his employees "continue to make the same or similar false inflated projections to current prospective investors even though they know that the projections are false." (*Id.* ¶ 15.)

(Harbor Bay, Most Frequently Asked Questions # 5, Ex. A to Bowman Decl.; *see also* Ex. K to Espinosa Decl.) Similar answers were included in the materials for each development, though some omitted the final sentence. Kirkland's accountant confirmed that the "200 phone calls per day" is an overstatement. (Johnson Sworn Statement at 127–28.) The average number of calls received *per month* at Harbor Bay was about 60; only once did the monthly tabulation exceed 200. (Ex. A to Yost Decl., Ex. 10 to Doc. 188.)

Kirkland told Mr. Dimapasok that the units were renting out pretty fast. (Dimapasok Decl. ¶¶ 4 & 8.) One investor visited a development and saw a sign that said the rent was $675; the sales representative told him that the minimum rent was raised because the rentals were going so well. (Beaver Sworn Statement at 55–56.) Beaver told visiting investors that tenant demand was high and that there would be no problem selling the units, which was false, (*Id.* at 60.) The sales letter sent to investor Karen Bowman read: "The interest and response in leasing these units has been tremendous! As you can see, we are extremely excited about the leasing demand for our senior triplexes!" (Letter, Ex. A to Bowman Decl.). It went on to read, "With our aggressive marketing strategies for our tenant base, through advertising, senior support groups, and healthcare professionals, and by preleasing of units prior to full construction, we feel that our ramp up time for occupancy will [ ] not be a lengthy process, and our vacancy rate will be very low." (*Id.*) The highest occupancy rate for Harbor Bay during the time period of June 2003 to October 2004 was 25%; the lowest was 16.4%. (*Id.*) There was no rational basis for making these exaggerated statements about tenant demand.

Kirkland and his agents further told investors that tenant demand was so high that there was a tenant waiting list to get into his developments. In the letter received by Bowman, the sales agent wrote, "Each occupant will agree to follow strict rules and policies. In seven years, we have had no problems in this area. As a matter of fact, we've always had a waiting list of people wanting to rent." (Letter, Ex. A to Bowman Decl.) Joanna Brooks, the Vice President of Tropical Village, was unaware of any tenant waiting lists, but under a strained construction of "waiting list," she explained that some people did call and inquire about renting while the project was still under construction, so those people were technically "waiting." (Brooks Sworn Statement at 29; *see also* Beaver Sworn Statement at 15.)

When rentals were not going as well, Kirkland stopped requiring that the renters be seniors, stopped requiring background checks, started offering three months' free rent, and significantly lowered the monthly rental fee. (Shanahan Decl. ¶¶ 12, 14.) The result was that tenants moved in who stole from the developments and destroyed property; the developments earned bad reputations. (Beaver Sworn Statement at 45–46, 49.) He did not inform his existing investors of these changes, nor did he inform new investors that tenant demand was nil.

*c. Failure to Disclose California Orders*

■ California issued two Desist and Refrain Orders against Kirkland, Tropical Village, Inc., and some of Kirkland's employees (Am. Answer ¶¶ 3 & 5; Compl. ¶ 5), on November 19, 2004 (Ex. 38 to Doc. 188; *see also* Am. Answer ¶ 46) and June 6, 2005 (Ex. 39 to Doc. 188; *see also* Am. Answer ¶ 49). Those orders charge Kirkland with selling unregistered securities

and with making material misrepresentations and omissions relating to their offering and sale in violation of the securities laws of California. (Exs. 38 & 39 to Doc. 188.) The second Order found that Kirkland, his companies, and his employees continued to offer and sell the investments under the new name Clarity Development Corporation to California residents despite notice of and receipt of the first Order. (Ex. 39 to Doc. 188; *see also* Showalter Sworn Statement at 55.) After receipt of the second Order, Kirkland continued operations under the name Senior Adult Living, Inc. California then issued a Temporary Restraining Order against Kirkland and his three companies on December 13, 2005. (Ex. 40 to Doc. 188; *see also* Am. Answer ¶ 52.)

When Kirkland received the first Order, he told his employees that it was not effective yet and that they could still send packages to California as long as they did not use the name Tropical Village, Inc. because the Order was directed at that business entity. (Johnson Sworn Statement 116–17; Green Sworn Statement at 55–56; Showalter Sworn Statement at 54; Brooks Sworn Statement at 74). He assured them that he confirmed the legality of continuing business in California with his attorney. (*Id.*; Green Sworn Statement at 56; Showalter Sworn Statement at 49; Am. Answer ¶ 47.) The majority of calls came from California. (Green Sworn Statement at 9; Showalter Sworn Statement at 48; Brooks Sworn Statement at 112–13.) Kirkland admits continuing to offer and sell his real estate units to California residents despite the first Desist and Refrain Order. (Am. Answer ¶ 47; Dimapasok Decl. ¶¶ 1–2, 10, 12.) Kirkland further admits not disclosing the first Order on either its website or advertising materials. (*Id.* ¶ 48.) He also admits that the website and advertising materials do not disclose either Order, but he states that his new company,

Senior Adult Living, Inc. discloses, without explanation, that the real estate developments are not available to California residents. (Am. Answer ¶ 51.) The "not available in California" appears at the bottom of the page underneath a picture.

Investor Dimapasok became aware of the order of June 2005 and asked Kirkland about it. (Dimapasok Decl. ¶ 12.) Kirkland told him that it was just a case of not having the proper licenses in California; he did not mention the allegations of fraud. (*Id.*) Agents in California conducted sting operations and found that Kirkland and his companies continued to offer triplex units to California residents despite the Desist and Refrain Orders. (*See* Wroten Decl., Ex. 20 to Doc. 188; Herrick Decl., Ex. 21 to Doc. 188.)

Recently, the Eleventh Circuit reversed a district court, on a finding of clear error, for failing to consider omission of a state cease and desist order as a material misrepresentation. The Court held "[t]he existence of a state cease and desist order against identical instruments is clearly relevant to a reasonable investor, who is naturally interested in whether management is following the law in marketing securities." *Merch. Capital*, 483 F.3d at 771; *see also SEC v. Physicians Guardian Unit Inv. Trust ex rel. Physicians Guardian, Inc.*, 72 F.Supp.2d 1342, 1351, 1353 (M.D.Fla.1999). Kirkland admits continuing business after the Orders were issued and he admits failing to disclose their existence to potential investors.

#### d. *Failure to Disclose Investor Lawsuits*

 Several lawsuits were filed in Florida state courts by investors seeking to recover their down payments (Am. Answer ¶ 54; *see also* Brooks Sworn Statement at 76), and sixty-two investors filed a

federal class action against Kirkland in November 2004, alleging securities law violations, fraud, and civil conspiracy (Am. Answer ¶ 55; Ex. 39 to Doc. 188 ¶ 17: *see also Angel v. Tropical Vill., Inc.*, No. 6:04–cv–1699 (M.D. Fla. filed Nov. 16, 2004)). Kirkland was also sued in Georgia by an investor for selling a house that he represented as a boarding house that he would outfit for that purpose and for which he would provide management. (*See Yarbrough v. Kirkland*, 249 Ga.App. 523, 548 S.E.2d 670 (2001), attached as Ex. 45 to Doc. 188; *see also* Beaver Sworn Statement at 43–44.) The investor sued Kirkland for fraud, punitive damages, and for violations of the Georgia Racketeer Influenced & Corrupt Organizations Act. (Ex. 39 to Doc. 188 ¶ 18; 249 Ga.App. at 525–26, 548 S.E.2d 670.) A jury awarded her $1.76 million dollars, which Kirkland partially paid in 2003. (Yip Aff. ¶ 16.) Neither the website nor the advertising material discloses any of these suits. (*Id.* ¶ 56.) Moreover, Kirkland specifically denied the existence of any lawsuits when he was directly asked by investors, even though the suits were existing and he was aware of them. (Adams Decl. ¶¶ 8 & 9; Dimapasok Decl. ¶¶ 7 & 12.)

### 2. Materiality

█ " 'Material information' is defined as information that is substantially likely to be important to a reasonable investor in deciding whether to purchase, sell, or hold securities." *Chem. Trust*, 2000 WL 33231600, at *10; *Merch. Capital*, 483 F.3d at 766, 768. Kirkland—both personally and through his sales representatives—made false representations regarding the projected rate of return, the actual rate of return, the level of tenant demand, tenant occupancy, and the success realized by earlier investors. All of this information is material to potential investors because it is directly tied to the level of risk associated with the investment. Failing to disclose investor lawsuits that include allegations of fraud stemming from the same business model is also material because that knowledge would assist investors in judging Kirkland's veracity and whether his businesses were legitimate and sound. Similarly, Kirkland's failure to disclose the Desist and Refrain Orders issued against him by the state of California to investors generally, and particularly to residents of California, is also material because those orders found that Kirkland's investment opportunities and his conduct in offering them for sale violated California securities laws, which are modeled after the federal securities laws.

### 3. Scienter

█ To act with scienter means that Kirkland must have acted intentionally or deliberately, as opposed to mistakenly or inadvertently, to "deceive, manipulate, or defraud." *Chem. Trust*, 2000 WL 33231600, at *10 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The Eleventh Circuit has held that in securities fraud actions, severe recklessness or knowing misconduct satisfies the level of knowledge or intent that a plaintiff must establish. *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989); *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir.1983). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *In re John Alden*, 249 F.Supp.2d at 1276 (quoting *McDonald*, 863 F.2d at 814). Kirkland's actions easily meet either standard.

Kirkland knew that while he was having little trouble selling his investment opportunities, he was having great difficulty finding renters to occupy the units. He was aware that his lack of cash flow prevented him from fulfilling his contractual obligation to furnish the units (Brooks Sworn Statement at 112), and that he was unable to pay bills. (Mem., Ex. E to Espinosa Decl.) Internally,[15] he implemented changes such as not requiring that the renters at the senior and adult living triplexes be senior citizens (Mem. from Patrick Kirkland to Premier Management Company, June 20, 2002, Ex. C to Espinosa Decl.), not requiring background checks (Mem. from Patrick Kirkland, May 21, 2002, Ex. B to Espinosa Decl.), not requiring minimum lease terms of one year (Exs. B & C to Espinosa Decl.), lowering the monthly rental fee by as much as $250 per month (*see e.g.,* Ex. C to Espinosa Decl.), and offering up to three months' free rent to try to fill the triplexes (*see e.g.,* Mem. from Kim Meredith–Hampton to Kirkland and Brooks, Oct. 29, 2002, Ex. D to Espinosa Decl.; Ex. B to Espinosa Decl.; Ex. E to Espinosa Decl. ("With the move ins under the 2 or 3 month free specials, we are losing a significant amount of income, which affects our owners['] cash flow,

HOA, paying bills, management fees and most significantly the quality of resident.")) Kirkland controlled the cash flow estimates sent to investors; he was aware of the discrepancy between the amount of money coming in and the amount needed to cover basic operational expenses; and he concealed the true occupancy rates at the developments. He prevented his investors from learning the true occupancy rates. In a sort of pyramid scheme fashion, Kirkland hoped to keep each project afloat with the deposits of newly signed investors. The fact that Kirkland manufactured evidence of success for his businesses—by drafting fake leases and having friends and family pretend to be satisfied investors to get other investors to jump on board his sinking ship—demonstrates that he was aware the concept was foundering, but he continued to sing its unrealized and highly improbable praises.

Because the undisputed facts establish that Kirkland was selling unregistered securities through his companies and because he committed securities fraud while offering and selling them, summary judgment must be entered against Kirkland and in favor of the SEC.

### IV. Remedies

The SEC seeks a permanent injunction, an order of disgorgement in the amount of

---

**15.** Kirkland drafted a memo on May 21, 2002 regarding the difficulties in leasing at Harbor Bay, Inc. He wrote:

WE HAVE BEEN CURRENTLY ADVERTISING HARBOR BAY AS A SENIORS APARTMENT WITH SHARED LIVING. THIS HAS NOT BEEN WORKING BECAUSE MOST OF THE PEOPLE WHO ARE ANSWERING OUR ADS ARE HIGHER INCOME PEOPLE WHO DO NOT WANT TO SHARE AN APARTMENT WITH ANYONE. WE ARE LIKE THE FLY THAT KEEPS RUNNING INTO THE GLASS WALL AND JUST KEEPS HITTING THE WALL HARDER BELIEVING THAT EVENTUALLY THIS COURSE OF ACTION WILL WORK. UNFORTUNATELY THIS IS

NOT WORKING AND IT IS TIME TO FLY IN A DIFFERENT DIRECTION. AS OF TODAY, MAY 21, 2002, I WOULD LIKE TO MAKE THE FOLLOWING CHANGES:

1. We are no longer giving away one month free.

2. All advertising shall reflect *Luxury Private Rooms* for lease either at $156.00 per week or $675.00 per month if paid in advance.

\* \* \*

4. We would still fill out the application and questionnaire, but would *not do a background check on our future tenants* and *we would move them in as soon as possible.* (Ex. B to Espinosa Decl.)

$70,330,136.47 with prejudgment interest in the amount of $3,087,783.10, and a civil penalty, the amount of which is to be determined at a later date.

■ Kirkland has raised the statute of limitations as an affirmative defense to the SEC's claims. Unless Congress indicates otherwise, there is no statutory limitations period for actions brought by the federal government in its sovereign capacity to vindicate public interests, such as the one here. *Calvo*, 378 F.3d at 1218; *SEC v. Diversified Corp. Consulting Group*, 378 F.3d 1219 (11th Cir.2004); *see also United States v. Banks*, 115 F.3d 916, 919 (11th Cir.1997).

### A. Permanent Injunction

■ The SEC can obtain an injunction pursuant to section 20(b) of the Securities Act if "it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir.2004) (citing *Unique Fin. Concepts*, 196 F.3d at 1199 n. 2). The SEC need not show irreparable injury or a balance of the equities in its favor to get the equitable relief it seeks. As addressed, Kirkland has violated both the registration provisions and the anti-fraud provisions of the securities laws. He was also engaged in similar fraudulent conduct in Georgia and had a jury verdict returned against him there. Thus, the Court need only consider, then, whether there is a reasonable likelihood that Kirkland will repeat his offensive conduct. To make that determination, the Court must consider the egregiousness of Kirkland's

actions, whether the violations were isolated or recurrent, his degree of scienter, his recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood that his occupation will present opportunities for future violations. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir.2004) (quoting *SEC v. Carriba Air., Inc.*, 681 F.2d 1318, 1322 (11th Cir.1982)): *SEC v. Friendly Power Co., LLC*, 49 F.Supp.2d 1363, 1372 (S.D.Fla.1999); *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir.1981).

Each of these factors weighs in favor of enjoining Kirkland because there is a reasonable likelihood that Kirkland will engage in similar, wrongful conduct in the future. Kirkland's violations were egregious, as was his disdain for administrative orders Issued against him. His conduct reveals a lengthy pattern of wrongful behavior, not an isolated incident. He sold securities in the form of investment contracts without filing a registration statement. His representations to investors had no basis in fact and were often flatly false. His actions were deliberate and knowing. Indeed, he attempted to evade the application of the securities regulations, of which he was well-aware, by trying to distance himself from the implementation of the pooling agreement. Kirkland still works in real estate,[16] and thus, his occupation presents a risk that he will commit future violations if not enjoined. He maintains he has done nothing wrong and still believes that he was offering a quality product. He has no remorse for those who lost money investing in him. It

---

**16.** Even though Kirkland repeatedly argues that he has been denied representation because of the asset freeze order, at a recent hearing on a motion to sell his personal residence, Kirkland said that he could afford the monthly mortgage and insurance payments on his home—approximately $25,000 per

month. (Hr'g Tr. 45–46, July 13, 2007.) This newfound income is apparently from working in real estate with his brother. (*Id.* at 46–47.) Kirkland initially had legal representation and he has not requested that counsel be appointed to him. He has also apparently not used this new income to secure new counsel.

is impossible to judge the sincerity of Kirkland's assurances against future violations because he has made none. The permanent injunction will be entered.

### B. Disgorgement and Prejudgment Interest

The equitable "remedy of disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *Friendly Power*, 49 F.Supp.2d at 1372. Upon showing "a reasonable approximation of the defendant's ill-gotten gains," the SEC is entitled to the remedy. Kirkland took in approximately $70.3 million through his sale of unregistered securities and aided by his misrepresentations as to expected profit and customer demand. (Yipp Aff. ¶¶ 5–6 & Ex. A thereto.) The SEC has met its burden of proof of establishing it is entitled to a disgorgement order, but the Court will hear argument and evidence on the amount to be disgorged and may consider the settlements of the private claims against him that he has reached with investors. (*See* Order, Doc. 162, filed September 6, 2006.) This hearing will coincide with the hearing on the civil penalty discussed below.

### C. Civil Penalty

The SEC also seeks a civil penalty pursuant to section 20(d) of the Securities Act and section 21(d) of the Exchange Act. The SEC is waiting, however, for a recommendation from the five-member Commission as to the amount of the penalty. The SEC asks the Court to reserve jurisdiction of this matter and grant the SEC 90 days from the date the Court enters this order to file the motion to set the specific civil penalty that should be awarded. (Doc. 188 at 31.) The requests will be granted.

When the Court takes up the civil penalty matter, the Court will also visit Kirk-

land's statute of limitations argument with respect to a civil penalty award because while it is clear that there is no applicable statute of limitations period applicable when the SEC seeks equitable relief in its enforcement actions, the issue is less than clear when the SEC seeks a civil penalty. *Compare* 28 U.S.C. § 2462 ("[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued") *with SEC v. Miller*, No. CIV. A.1:04CV1655–JEC, 2006 WL 2189697, at *7–8 & n. 9 (N.D.Ga. July 31, 2006) (acknowledging that in both *Calvo* and *Diversified Corporate Consulting*, the Eleventh Circuit suggested that no statute of limitations applies to a claim for civil penalties pursued under 15 U.S.C. § 77t(d)).

The SEC has conceded that Kirkland's argument as to the civil penalty remedy is arguable, but it notes that 175 of the 186 purchases occurred within the five-year statute of limitations period, *if* the five-year catch-all provision applies. (Doc. 188 at 23.) Because the SEC asks the Court to reserve ruling on the civil penalty issue, the Court will consider at a later date the applicability of the statute of limitations to any judgment of civil penalty.

### V. Conclusion

Kirkland's senior triplex offerings constitute securities in the form of investment contracts. As such, the offerings must be registered in accordance with securities regulations or else qualify for an exemption. Kirkland did not register the securities he offered, nor did he argue that any exemption applies. In addition, Kirkland committed securities fraud in the offer and sale of his triplexes because he made knowing, material misrepresentations and omissions regarding their offering and sale

while using the means and instruments of interstate commerce. A permanent injunction is warranted because of the reasonable likelihood that Kirkland will commit wrongful conduct in the future. The SEC is also entitled to a disgorgement order with prejudgment interest and a civil penalty, the amounts of which are to be determined at a later date. Kirkland's argument that the five-year statute of limitations bars or limits an award of a civil penalty wilt be considered at that time.

In accordance with the foregoing, it is hereby **ORDERED** and **ADJUDGED:**

1. Plaintiff's Motion for Summary Judgment Against Defendant Patrick Kirkland (Doc. 188) is **GRANTED.**

2. Defendant Patrick Kirkland's Motion for Summary Judgment Against the SEC (Doc. 304) is **DENIED.**

3. Defendant Kirkland, his agents, servants, employees, attorneys, and all persons in active concert or participation with him are **PERMANENTLY ENJOINED** from violating: section 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c); section 17(a)(1)of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1); sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933, 15 U.S.C. §§ 77(q)(a)(2) and 77q(a)(3); and section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, thereunder, 17 C.F.R. § 240.10b–5.

4. Defendant Kirkland shall be **DISGORGED,** with prejudgment interest, of all ill-gotten profits or proceeds received from the investing public as a result of the acts or courses of conduct described in the Complaint, less any distributions made by the Receiver to investors, plus prejudgment interest. The Court shall hold a hearing to consider the relevance of any settlement agreements that Kirkland has entered into with investors and to deter-mine the appropriate amount to be disgorged.

5. The Court reserves jurisdiction over this matter and grants the SEC 90 days from the date on which this Order is entered to move the Court to determine a specific civil penalty against Kirkland, at which time the Court will consider the applicability of any statute of limitations period with respect to civil penalties.

6. Defendant Patrick Kirkland's Motion for Entry of Order Directing Receiver to Refund Purchasers' Earnest Money Deposits (Doc. 273) is **DENIED.**